**Slip Op. 20-174**

**UNITED STATES
COURT OF INTERNATIONAL TRADE**

━━━━━━━━━━━━━

**Court No. 19-00055**

━━━━━━━━━━━━━

HUNG VUONG CORPORATION, *et al.*,

*Plaintiffs,*

v.

UNITED STATES,

*Defendant,*

and

CATFISH FARMERS OF AMERICA, *et al.*,

*Defendant-Intervenors.*

━━━━━━━━━━━━━

Before: M. Miller Baker, Judge

**OPINION AND ORDER**

[Plaintiffs' motion for judgment on the agency record is granted in part and denied in part. The Court remands to Commerce for further proceedings consistent with this opinion.]

Dated: December 3, 2020

*Robert L. LaFrankie*, Crowell & Moring LLP of Washington, DC, argued for Plaintiffs.

*Kara M. Westercamp*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice of Washington, DC, argued for Defendant.

Court No. 19-00055                              Page 2

With her on the brief were *Joseph H. Hunt*, Assistant Attorney General; *Jeanne E. Davidson*, Director; *Patricia M. McCarthy*, Assistant Director. Of counsel on the brief was *Ian A. McInerney*, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce of Washington, DC.

*Jonathan M. Zielinski*, Cassidy Levy Kent (USA) LLP of Washington, DC, argued for Defendant-Intervenors. With him on the brief were *James R. Cannon, Jr.*, and *Jeffrey B. Denning*.

*Baker*, Judge: In some quarters, the humble catfish has a bad reputation. It's ugly, often maligned as a "bottom-feeder," and with fins that sting, it's not so easy to remove from a fishing line intended for statelier fish.[1] But as reported in the newspaper of record, the ugly, ungainly, and prickly catfish is, in fact, a delicacy. Craig Claiborne, "Catfish, Long a Southern Delicacy, Branches Out," *N.Y. Times*, Nov. 11, 1981, at C6. As a result, commercial catfish farming is a big business in this country.

Indeed, the demand for catfish is so great that foreign producers have entered the domestic market. Some of those producers are in Vietnam. In 2003, the Commerce Department determined that "catfish"[2]

---

[1] Use of pliers is highly recommended.

[2] In 2002, Congress amended the Federal Food, Drug, and Cosmetic Act to provide that "the term 'catfish' may only be considered to be a common or usual name (or part thereof) for fish classified within the family Ictaluridae" and, further, that "only labeling or advertising for fish classified within that family [i.e., Ictaluridae] may include the term

produced in Vietnam and exported to this country were dumped in the U.S., i.e., sold in the U.S. at below the normal sales price in Vietnam,[3] and Commerce imposed import duties.

Under the statutory and administrative scheme, antidumping duties can be reviewed once per year and may be adjusted (upwards or downwards) as to particular entities. This litigation stems from the 14th such review[4] of the antidumping order as to certain frozen fish fillets from Vietnam.

---

'catfish.' " 21 U.S.C. § 321d(a)(1)(A)–(B). The Vietnamese-produced fish at issue in this case are of the species *pangasius* and thus may not legally be marketed in the United States under the name "catfish." Nevertheless, the domestic market apparently perceives the Vietnamese species as functionally equivalent to homegrown catfish.

[3] As explained further below, determining the "normal" sales price in a country with a non-market economy such as Vietnam adds another layer of complexity in antidumping cases.

[4] Lest the reader unfamiliar with trade law conclude "14th administrative review" suggests this case is an administrative law version of *Jarndyce v. Jarndyce*, fear not. On the anniversary of an antidumping order, various affected parties (e.g., foreign producers and exporters and domestic competitors) may request an "administrative review" to determine the actual assessment rates as to particular subject merchandise for the preceding twelve-month period. *See infra* Statutory and Regulatory Background Part B. In short, each review is distinct, factually and legally, from any preceding review(s) and is best understood as periodic maintenance of the original antidumping order.

Court No. 19-00055                                    Page 4

In that review, Commerce found that it could not verify information submitted by the Vietnamese producer and that the administrative record was otherwise incomplete in several respects. Commerce further found that these information deficiencies resulted from the producer's failure to cooperate to the best of its ability and therefore supplied the missing information by assuming facts most adverse to the producer, which resulted in the highest possible import duty.

The Vietnamese producer then brought this action challenging Commerce's decision. After briefing and argument on the producer's motion for judgment on the agency record, the Court grants the motion in part, denies the motion in part, and remands for further proceedings consistent with this opinion.

## Table of Contents

Statutory and Regulatory Background......................6

  A. Antidumping Orders..........................................6

  B. The Administrative Review Process .................8

    1. Purpose of the review ...................................8

    2. Selection of respondents ...............................9

    3. Verification of respondents' answers......... 11

    4. "Adverse facts available" ........................... 12

  C. Reviews Involving Non-Market Economies.... 18

    1. Factors of production ................................. 19

    2. Control numbers ....................................... 21

    3. Country-wide versus separate rates.......... 22

Court No. 19-00055 Page 5

Factual and Procedural Background ........................ 23

    A. The Review ...................................................... 24

        1. Commerce preliminarily assigned
           Hung Vuong a $0.00 dumping margin. ..... 25

        2. Commerce issued supplemental
           questionnaires and conducted
           verification in Vietnam. ............................. 26

        3. Commerce issued its final decision
           and assigned Hung Vuong a $3.87/kg
           dumping margin after applying facts
           available with an adverse inference. ........ 27

    B. This Lawsuit .................................................. 29

Jurisdiction and Standard of Review ....................... 29

Analysis .................................................................... 30

I.  Hung Vuong Fails to Overcome the
    Presumption That Commerce Acted
    in Good Faith. ....................................................... 30

II. The Court Sustains in Part and Remands
    in Part Commerce's Determination to Apply
    Facts Otherwise Available with an Adverse
    Inference. .............................................................. 35

    A. Failure to Retain Source Documents ............. 36

        1. Commerce's findings ................................. 37

        2. The administrative record permitted
           Commerce to apply facts otherwise
           available with an adverse inference
           as to the failure to retain source
           documents .................................................. 41

    B. Hung Vuong's Relationship with
       Customers ......................................................... 52

        1. Commerce's findings ................................. 54

2.  Commerce must reconsider its
    application of facts otherwise
    available with an adverse inference
    as to customer relationships. ..................... 55

C.  Control Number Reporting............................ 62

    1.  Commerce's findings................................. 62

    2.  The administrative record permitted
        Commerce to apply facts otherwise
        available with an adverse inference
        as to control number reporting. ................. 64

D.  Factors of Production...................................... 77

    1.  Commerce's findings................................. 77

    2.  The administrative record did not
        permit Commerce to apply facts
        otherwise available with an adverse
        inference as to the fish byproducts
        portion of Hung Vuong's factors of
        production data. .......................................... 79

E.  The Court Is Required to Remand
    Commerce's Decision to Apply
    "Total AFA." ..................................................... 87

F.  The Rate Commerce Applied Must Be
    Reconsidered on Remand. .............................. 91

Order........................................................................ 92

## Statutory and Regulatory Background

### A. Antidumping Orders

The federal antidumping statute provides a mech-
anism for imposing remedial duties on imported mer-
chandise sold, or likely to be sold, in the United States
at "less than its fair value." 19 U.S.C. § 1673(1). The

gist of the process is that an "interested party" as de-fined in the Tariff Act of 1930[5] files a petition simulta-neously with Commerce and the International Trade Commission alleging that a U.S. domestic industry is materially injured or threatened with material injury by such imports. U.S. Int'l Trade Comm'n, Publication 4540, *Antidumping and Countervailing Duty Hand-book*, at I-3 (14th ed. June 2015), *available at* https://www.usitc.gov/trade_remedy/documents/hand book.pdf (accessed Nov. 17, 2020).

Commerce then investigates whether the petition contains sufficient allegations of dumping and, if so, whether dumping is occurring, while the ITC investi-gates whether the relevant domestic industry is being, or is likely to be, materially injured. If both agencies find in the affirmative, Commerce publishes an anti-dumping order in the Federal Register imposing an antidumping duty "in an amount equal to the amount by which the normal value exceeds the export price (or the constructed export price) for the merchandise." 19 U.S.C. § 1673.[6] The antidumping duty is in addition

---

[5] The statute provides that an "interested party" described in subparagraph (C), (D), (E), (F), or (G) of Section 771(9) of that Act (codified at 19 U.S.C. § 1677(9)) may file a peti-tion on behalf of a domestic industry. *See* 19 U.S.C. § 1673a(b)(1). The specified subparagraphs refer to various domestic entities involved in the production of a "domestic like product." *Id.* § 1677(9)(C)–(G).

[6] "Normal value" essentially refers to the price at which the subject merchandise is sold in the country from which it is exported. *RHP Bearings Ltd. v. United States*, 288 F.3d 1334, 1337 (Fed. Cir. 2002). For example, the normal value of a widget exported from Country Q is the price at which

to any other duty imposed on the subject merchandise. 19 U.S.C. § 1673.

## B. The Administrative Review Process

### 1.  Purpose of the review

Because relevant background facts and market conditions change over time, the statutory and regulatory framework provides for administrative reviews of antidumping orders to adjust the rate. During the order's anniversary month,[7] domestic interested parties[8] may submit written requests asking Commerce to conduct an administrative review of specific foreign exporters or producers covered by the order. 19 C.F.R. § 351.213(b)(1). Exporters or producers covered by an antidumping order, or importers of exporters' or

---

that widget is sold in Country Q. The terms "export price" and "constructed export price" are nuanced and discussed in detail in note 34, *infra*; for now, and ignoring nuance, think broadly of the antidumping duty as the price at which the hypothetical Country Q widget is sold in Country Q (normal value) minus the price at which that same Country Q widget is sold in the United States (export price or constructed export price). If the Country Q home market price exceeds the price in the United States, the difference is the extent to which that product is "dumped."

[7] The term "anniversary month" is defined, in relevant part, as referring to "the calendar month in which the anniversary of the date of publication of an order . . . occurs." 19 C.F.R. § 351.102(b)(5). In this case, the original antidumping order was issued in August 2003, so parties seeking administrative review of that order submit requests during subsequent Augusts.

[8] *See supra* note 5.

producers' merchandise covered by such an order, may
similarly request a review of that order as it applies to
them individually (in the case of an exporter or pro-
ducer) or merchandise imported by them (in the case
of an importer). *Id.* § 351.213(b)(2), (3).

The period of review covers the 12 months immedi-
ately preceding the most recent anniversary month.
*Id.* § 351.213(e)(1)(i). Completion of the review is sub-
ject to strict time limits. *See* 19 U.S.C. § 1675(a)(3)(A);
19 C.F.R. § 351.213(h)(1)–(2).

If no domestic interested party, affected foreign ex-
porter, producer, or importer requests an administra-
tive review, the then-current antidumping rate, re-
ferred to as the "preexisting rate," continues to apply.

## 2. Selection of respondents

If Commerce undertakes an administrative review,
the Department must "determine the individual
weighted average dumping margin for each known ex-
porter and producer of the subject merchandise."
19 U.S.C. § 1677f-1(c)(1). Commerce may invoke an ex-
ception, however, "[i]f it is not practicable to make in-
dividual weighted average dumping margin determi-
nations . . . because of the large number of exporters
or producers involved in the investigation or review,"
*id.* § 1677f-1(c)(2), in which case Commerce is to make
the determination "for a reasonable number of export-
ers or producers by limiting its examination to" either
a "statistically valid" sampling of exporters or produc-
ers, *id.* § 1677f-1(c)(2)(A), or "exporters and producers
accounting for the largest volume of the subject

merchandise from the exporting country that can be reasonably examined," *id.* § 1677f-1(c)(2)(B).

When Commerce implements this statutory exception, it identifies some exporters or producers as to whom it will make the "individual" determination; they are referred to as "mandatory respondents," who will receive individual antidumping rates at the end of the review, while exporters or producers not individually reviewed will receive either an "all others" rate or a nationwide single rate. 19 U.S.C. § 1673d(c)(1)(B)(i), (c)(5).[9]

Commerce then sends questionnaires to mandatory respondents seeking information for purposes of the review. 19 C.F.R. § 351.221(b)(2). The questionnaires give precise instructions on what information Commerce wants, in what form it must be reported, and when it is due.

The questionnaire answers are critical as respondents have the burden of creating an accurate admini-

---

[9] A review may also include "voluntary respondents," which refers to interested parties who apply for that treatment pursuant to 19 C.F.R. § 351.204(d). Commerce must establish individual antidumping rates for voluntary respondents who timely submit the information required of the mandatory respondents, provided examination of voluntary respondents will not be unduly burdensome to Commerce such that it "inhibit[s] the timely completion of the investigation or review." 19 U.S.C. § 1677m(a)(1)(B). As a practical matter, therefore, a "voluntary respondent" is likely to be an exporter or producer that believes it can get a lower antidumping rate by seeking separate examination.

strative record. *Ta Chen Stainless Steel Pipe, Inc. v. United States*, 298 F.3d 1330, 1336 (Fed. Cir. 2002) (citing *Zenith Elecs. Corp. v. United States*, 988 F.2d 1573, 1583 (Fed. Cir. 1993)). Respondents have this burden because they control the information that Commerce needs to complete its review. *Id.*

### 3. Verification of respondents' answers

After the respondents answer the questionnaires, Commerce may conduct "verification." "Verification is like an audit, the purpose of which is to test information provided by a party for accuracy and completeness." *Bomont Indus. v. United States*, 733 F. Supp. 1507, 1508 (CIT 1990) (cleaned up).[10] Commerce admonishes respondents that submission of new information at verification is inappropriate unless the need for the information was not already apparent; the information makes minor corrections to information already on the record; or the information corroborates, supports, or clarifies information already on the record.[11] "Although Commerce has authority to place

---

[10] Commerce has latitude in how it conducts verification, and there is no requirement to verify everything in a respondent's questionnaire. *U.S. Steel Corp. v. United States*, 953 F. Supp. 2d 1332, 1348 (CIT 2013).

[11] Commerce is permitted to limit its acceptance of new information at the verification stage to "minor corrections and clarifications." *China Steel Corp. v. United States*, 393 F. Supp. 3d 1322, 1342 (CIT 2019) (citing *Maui Pineapple Co. v. United States*, 264 F. Supp. 2d 1244, 1257–58 (CIT 2003)); *see also Dongguan Sunrise Furniture Co. v. United States*, 865 F. Supp. 2d 1216, 1231–32 (CIT 2012) (finding Commerce acted reasonably in refusing to accept post-

documents in the administrative record that it deems relevant, the burden of creating an adequate record lies with interested parties and not with Commerce." *QVD Food Co. v. United States*, 658 F.3d 1318, 1324 (Fed. Cir. 2011) (cleaned up).

### 4. "Adverse facts available"

In certain statutorily-defined situations, Commerce is required to supply facts not in the administrative record to complete its antidumping investigation or administrative review. In limited circumstances, the statute also permits Commerce—when supplying such facts—to take the additional step of choosing facts that are adverse to the respondent in an investigation or administrative review. The case law and litigants frequently use the shorthand terms "adverse facts available" or "AFA" to describe this two-step analysis, but that jargon is potentially misleading because it collapses together the two distinct steps.

In the first step, the statute requires Commerce to apply "facts otherwise available," i.e., facts not in the record, in various defined circumstances. *If* Commerce applies facts otherwise available, Commerce then proceeds to the next step. In step two, *if* Commerce determines that a respondent has not cooperated to the best of its ability, it may then apply an adverse inference,

---

verification submissions due to time limits, inability to issue supplemental questions and verify the new submissions, and because "allowing a party to wait until Commerce discovers an omission would allow the party to game the system").

Court No. 19-00055                              Page 13

i.e., select from among facts that are most unfavorable
to the respondent, in applying facts otherwise availa-
ble.

   In short, Commerce's application of facts otherwise
available is a necessary, but not sufficient, condition
to the Department's application of an adverse infer-
ence in selecting among those facts. The Court de-
scribes each of these steps below.

### a. Facts otherwise available

   Commerce is required to apply "facts otherwise
available" in specified situations:

(a) In general. If—

   (1) necessary information is not available on
   the record, or

   (2) an interested party or any other person—

      (A) withholds information that has been
      requested by [Commerce] . . . under this
      subtitle,

      (B) fails to provide such information by the
      deadlines for submission of the infor-
      mation or in the form and manner re-
      quested, subject to subsections (c)(1) and
      (e) of section 1677m of this title,

      (C) significantly impedes a proceeding un-
      der this subtitle, or

(D) provides such information but the information cannot be verified as provided in section 1677m(i) of this title,

[Commerce] . . . *shall*, subject to section 1677m(d) of this title, use the facts otherwise available in reaching the applicable determination under this subtitle.

19 U.S.C. § 1677e(a) (emphasis added).

Subsection 1677e(a) has several layers and multiple uses of the disjunctive. Notably, paragraphs (1) and (2) are in the alternative, joined by the word "or," meaning that Commerce must use facts otherwise available if *either* necessary information is not available *or* the circumstances in paragraph (2) apply.

Paragraph (2), in turn, contains four subparagraphs that are likewise joined by the word "or," meaning that if any one (or more) of the conditions listed in paragraph (2) applies, Commerce must use facts otherwise available.

The first pathway for applying the "facts otherwise available" analysis—paragraph *(1)* of subsection 1677e(a)—focuses solely on the *absence* of necessary information, not on the reason why it is missing. If "necessary information is not available on the record," for any reason, Commerce must use facts otherwise available. *See* 19 U.S.C. § 1677e(a)(1).

The alternative pathway for applying "facts otherwise available"—paragraph *(2)* of subsection 1677e(a)—focuses on the respondent's acts and

omissions affecting the administrative record. Notably, whereas paragraph (1) asks whether "*necessary* information is not available on the record," *see* 19 U.S.C. § 1677e(a)(1), paragraph (2) omits the word "necessary" and focuses on whether a respondent has withheld *any* requested information (regardless of whether it seems tangential or trivial), *id.* § 1677e(a)(2)(A), has failed to comply with deadlines or provided information in the wrong form or manner, *id*. § 1677e(a)(2)(B),[12] significantly impeded the proceeding, *id*. § 1677e(a)(2)(C), or provided information that could not be verified, *id.* § 1677e(a)(2)(D).[13]

---

[12] Section 1677e(a)(2)(B) in turn is further qualified by 19 U.S.C. §§ 1677m(c)(1) and 1677m(e), which impose limits on Commerce's ability to apply facts otherwise available when a respondent has failed to comply with Commerce's deadlines or requirements as to the form and manner requested.

[13] In *Nippon Steel Corp. v. United States*, the Federal Circuit characterized § 1677e(a) as follows: "Under subsection (a), if a respondent 'fails to provide [requested] information by the deadlines for submission, Commerce shall fill in the gaps with 'facts otherwise available.' The focus of subsection (a) is respondent's *failure to provide information*. The reason for the failure is of no moment." 337 F.3d 1373, 1381 (Fed. Cir. 2003) (brackets and emphasis in original).

*Nippon Steel*'s characterization of subsection (a) is overbroad and overlooks the provision's careful nuances. The court only quoted subparagraph (B) of paragraph (2) of subsection (a)—§ 1677e(a)(2)*(B),* which addresses the respondent's failure to provide information *in a timely fashion* or *in the form and manner* requested. But § 1677e(a)*(1),* which the *Nippon Steel* court did not discuss, asks solely "whether necessary information is not available on the

Finally, § 1677e(a) provides that Commerce's re-
sorting to "facts otherwise available" is "subject to sec-
tion 1677m(d) of this title." Section 1677m(d) in turn
provides that when information submissions are non-
compliant with Commerce's requirements, the Depart-
ment "shall promptly inform the person submitting
the response of the nature of the deficiency and shall,
to the extent practicable, provide that person with an
opportunity to remedy or explain the deficiency in
light of the time limits established for the completion
of investigations or reviews under this subtitle."
19 U.S.C. § 1677m(d). Thus, Commerce is to give no-
tice of a deficiency and an opportunity to cure it, but
the statute qualifies that obligation by allowing Com-
merce to consider whether it would be "practicable" to
do so and whether the statutory deadline for complet-
ing the review would allow it.

---

record." 19 U.S.C. § 1677e(a)(1). If necessary information is
missing, *whatever the reason*, regardless of whether it is
due to the respondent's failure to provide it, then Com-
merce applies "facts otherwise available." *Alternatively*, if
the respondent acts or omits to act in specified ways in con-
nection with the administrative record—*regardless* of the
reason for the act and whether the information in question
is necessary—then Commerce also applies "facts otherwise
available." *See id.* § 1677e(a)(2)(A)–(D). In short, *Nippon
Steel*'s statement that "the focus of subsection (a) is re-
spondent's *failure to provide information*" is accurate only
insofar as it applies to subparagraph *(A)* of paragraph (2)
of subsection (a). *See id.* § 1677e(a)(2)(A) (allowing the use
of "facts available" if a respondent "withholds information
that has been requested" by Commerce).

## b. Adverse inference

The second step in the "adverse facts available" analysis focuses on whether "an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information" from Commerce. 19 U.S.C. § 1677e(b)(1). If Commerce finds such a failure to cooperate, the Department "may use an inference that is adverse to the interests of that party in selecting from the facts otherwise available" and "is not required to determine, or make any adjustments to, a . . . weighted average dumping margin based on any assumptions about information the interested party would have provided if the interested party had complied with the request for information." *Id.* § 1677e(b)(1)(A)–(B). The statute allows Commerce to use any dumping margin from any "segment of the proceeding under the applicable antidumping order," including the highest such margin, and further provides that Commerce need not corroborate any dumping margin applied in any other segment. *Id.* § 1677e(d)(1)(B), (d)(2), (c)(2).

The "adverse inference" analysis focuses on the respondent's "failure to cooperate to the best of its ability, not its failure to provide requested information." *Nippon Steel*, 337 F.3d at 1381 (cleaned up). For Commerce to conclude that a respondent failed to cooperate "to the best of its ability" such that an adverse inference is appropriate, "Commerce need only make two showings." *Id.* at 1382.

First, Commerce must make "an objective showing that a reasonable and responsible importer would

have known that the requested information was re-
quired to be kept and maintained under the applicable
statutes, rules, and regulations." *Id.* (citing *Ta Chen
Stainless Steel Pipe, Inc. v. United States*, 298 F.3d
1330, 1336 (Fed. Cir. 2002), for the point that Com-
merce had reasonably expected an importer to main-
tain records of an accused antidumping activity).

Second, Commerce must show that the respond-
ent's failure to fully respond stems from "*either*:
(a) failing to keep and maintain all required records,
*or* (b) failing to put forth its maximum efforts to inves-
tigate and obtain the requested information from its
records." *Id.* (emphasis added).

The key is whether "it is reasonable for Commerce
to expect that more forthcoming responses should
have been made." *Id.* at 1383. Intentional conduct is
not necessary—"[t]he statutory trigger for Commerce's
consideration of an adverse inference is simply a fail-
ure to cooperate to the best of respondent's ability, re-
gardless of motivation or intent." *Id.*

## C. Reviews Involving Non-Market Econo-mies

As noted above, the antidumping statute requires
that Commerce determine the subject merchandise's
"normal value" and then compare that value to the ex-
port price or constructed export price. 19 U.S.C.
§ 1677b(a). When goods subject to an antidumping in-
vestigation are produced in a country with a "non-mar-
ket economy," the statute requires Commerce to as-
sume that home-market sales are not reliable

indicators of normal value because the economy is presumed to be under state control. *Taian Ziyang Food Co. v. United States*, 637 F. Supp. 2d 1093, 1105 (CIT 2009).

A "non-market economy" is "any foreign country that [Commerce] determines does not operate on market principles of cost or pricing structures, so that sales of merchandise in such country do not reflect the fair value of the merchandise." 19 U.S.C. § 1677(18)(A).

## 1. Factors of production

For merchandise imported from a non-market economy country, the statute requires Commerce to

> determine the normal value of the subject merchandise on the basis of the value of the factors of production utilized in producing the merchandise and to which shall be added an amount for general expenses and profit plus the cost of containers, coverings, and other expenses. . . . [T]he valuation of the *factors of production* shall be based on the best available information regarding the values of such factors in a market economy country or countries considered to be appropriate by [Commerce].

19 U.S.C. § 1677b(c)(1) (emphasis added).

"Factors of production" in § 1677b(c)(1) include, but are not limited to, hours of labor required, quantities of raw materials employed, amounts of energy and other utilities consumed, and representative capital

cost (including depreciation). *Id.* § 1677b(c)(3). In valuing factors of production as described above, Commerce must "utilize, to the extent possible, the prices or costs of factors of production in one or more market economy countries that are—(A) at a level of economic development comparable to that of the nonmarket economy country, and (B) significant producers of comparable merchandise." *Id.* § 1677b(c)(4).

In other words, for purposes of this case, "factors of production" means all the different things that go into farming fish—fish feed, electricity, labor, etc. All these things cost money, so theoretically the product's price should reflect these costs. The statute essentially requires Commerce to determine what the producer would have spent to prepare the subject merchandise if the country of origin had a market economy rather than a non-market economy. *See Lasko Metal Prods., Inc. v. United States*, 810 F. Supp. 314, 316–17 (CIT 1992) ("With respect to [non-market economy] goods, the statute's goal is to determine what the cost of producing such goods would be in a market economy."), *aff'd*, 43 F.3d 1442 (Fed. Cir. 1994); *see also Baoding Yude Chem. Indus. Co. v. United States*, 170 F. Supp. 2d 1335, 1345 (CIT 2001) (explaining that the task is not to construct the cost of producing the subject merchandise in a particular market economy, but rather to use data from comparable market-economy countries to construct what the cost of production would have been in the actual country of origin if it were a market economy country).

### 2. **Control numbers**

To tie the factors of production to the subject merchandise in a meaningful way, Commerce uses a reporting system it calls "control numbers." This term is "Commerce jargon for a unique product defined in terms of a hierarchy of specified physical characteristics determined in each antidumping proceeding." *GODACO Seafood Joint Stock Co. v. United States*, 435 F. Supp. 3d 1342, 1348 n.1 (CIT 2020) (cleaned up) (quoting *Union Steel v. United States*, 823 F. Supp. 2d 1346, 1349 (CIT 2012)). "All products whose product hierarchy characteristics are identical are deemed to be part of the same [control number] and are regarded as ' "identical" merchandise' for the purposes of comparing export prices to [normal value]." *Am. Tubular Prods., LLC v. United States*, Slip Op. 15-98, at 5 n.1, 2015 WL 5236010, at *2 n.1 (CIT Aug. 28, 2015) (quoting *Union Steel*, 823 F. Supp. 2d at 1349).[14]

Control numbers vary from case to case. Commerce's questionnaires provide the control numbers applicable in a particular review. *See An Giang Fisheries Import & Export Joint Stock Co. v. United States*, 287 F. Supp. 3d 1361, 1367 n.7 (CIT 2018). Commerce insists that respondents tie their factors of production to control numbers because "Commerce uses the respondents' [control number–]specific [factors of

---

[14] To be clear, a control number is not a serial number. Whereas a serial number might denominate a specific widget to distinguish it from otherwise identical widgets, a control number serves a more abstract purpose: describing the characteristics of a class or group of widgets.

production] to construct the value of the product sold by the respondent company in the United States to ensure that a fair comparison is made between the U.S. price and normal value." *Thuan An Prod. Trading & Serv. Co. v. United States*, 348 F. Supp. 3d 1340, 1353 (CIT 2018) (cleaned up).

Commerce employs the "control number" system because often an antidumping investigation will involve a range of products that are similar but not identical. Commerce uses "control numbers" to distinguish such products from each other to allow a comparison of normal value and export price as to each unique product, as determined based on physical characteristics (for example, in this case, whether a frozen fish fillet is glazed or unglazed). Each unique product is assigned a particular control number based on its characteristics.[15]

### 3. Country-wide versus separate rates

Another special consideration in non-market economy cases involves the "country-wide rate" versus

---

[15] Because similar products may have different physical characteristics despite falling within the same antidumping order, the products may have different factors of production unique from one another (for example, the glazed fish fillet will involve some expense for whatever is used in the glazing process, while the unglazed fillet will not). "Because some of these specific factors of production may cost more than others, Commerce compares the U.S. sales price and factors of production for unique products, i.e., those with the same [control numbers], to obtain the most accurate dumping margins." *Yantai Xinhe Steel Structure Co. v. United States*, 36 CIT 1035, 1051 (2012).

"separate rates." Because Commerce presumes that all commercial industries in a non-market economy country operate under government control, all entities within such a country producing subject merchandise will receive a single country-wide antidumping duty rate unless an individual entity demonstrates that it is both *de jure* and *de facto* independent of the central government. *Sigma Corp. v. United States*, 117 F.3d 1401, 1405 (Fed. Cir. 1997); *see also Zhejiang Zhaofeng Mech. & Elec. Co. v. United States*, 355 F. Supp. 3d 1329, 1333 (CIT 2018) (explaining what the entity must establish to receive a separate rate).

Thus, in the context of an administrative review of an antidumping order applicable to merchandise from a non-market economy country, the most recent single country-wide rate applicable to the subject merchandise continues to apply unless (a) Commerce reviews, and revises, the country-wide rate or (b) a particular respondent applies for, and receives, a separate rate (in which case the nationwide single rate continues to apply to other companies who do not receive separate rates). *See Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Preliminary Results of the Antidumping Duty Administrative Review, Preliminary Determination of No Shipments and Partial Rescission of the Antidumping Duty Administrative Review; 2016–2017*, 83 Fed. Reg. 46,479, 46,480 (Dep't Commerce Sept. 13, 2018).

## Factual and Procedural Background

This litigation stems from a 2003 antidumping order on frozen fish fillets imported from Vietnam. *See*

*Notice of Antidumping Duty Order: Certain Frozen Fish Fillets from the Socialist Republic of Vietnam*, 68 Fed. Reg. 47,909 (Dep't Commerce Aug. 12, 2003). That order found that certain frozen fish fillets from Vietnam were being sold in the U.S. at less than fair value and imposed cash deposits based on the estimated weighted-average margins. The order imposed specific rates for certain exporters and a "Vietnam-wide" rate for anyone not specifically listed. *See id*. at 47,909–10.[16] In the intervening seventeen years, that order underwent multiple administrative reviews as described above.

## A. The Review

Commerce commenced the 14th administrative review of the 2003 antidumping order after receiving a request from Catfish Farmers of America[17] and several of its constituent members (collectively, "Catfish Farmers") to review the rate as to multiple entities, including several affiliated Vietnamese producers known collectively as the Hung Vuong Group.[18] The

---

[16] Commerce had previously determined that Vietnam is a "non-market economy" for purposes of U.S. antidumping laws. *See Notice of Final Antidumping Determination of Sales at Less Than Fair Value and Affirmative Critical Circumstances: Certain Frozen Fish Fillets from the Socialist Republic of Vietnam*, 68 Fed. Reg. 37,116, 37,119 (Dep't Commerce June 23, 2003). That designation remains in effect.

[17] Catfish Farmers of America is a trade association representing domestic catfish farmers and processors.

[18] Hung Vuong includes the following companies: An Giang Fisheries Import & Export Joint Stock Company, also

period of review was August 1, 2016, to July 31, 2017, the 12-month period preceding the anniversary month of the original August 2003 antidumping order. *See* ECF 61-1, at 62.[19]

No party asked Commerce to review the Vietnam-wide rate as part of the 14th administrative review, so the preexisting rate of $2.39 per kilogram continued to apply to companies who had not applied for, and received, a separate rate. 83 Fed. Reg. at 46,480. Commerce selected mandatory respondents for the review; among them was Hung Vuong.

### 1. Commerce preliminarily assigned Hung Vuong a $0.00 dumping margin.

After selecting Hung Vuong as a respondent, Commerce propounded a series of lengthy questionnaires.[20] Hung Vuong submitted extensive information in response.

Commerce preliminarily determined that Hung Vuong was entitled to separate rate status and assigned it a dumping margin of zero. 83 Fed. Reg.

---

known as Agifish; Asia Pangasius Company Limited; Europe Joint Stock Company; Hung Vuong Joint Stock Company; Hung Vuong Mascato Company, Limited; Hung Vuong–Vinh Long Co., Ltd.; and Hung Vuong–Sa Dec Co., Ltd. ECF 25-5, at 1 n.2.

[19] In this opinion, pagination references in citations to the Court record are to the pagination found in the ECF header at the top of each page.

[20] Commerce's original questionnaire is part of the public joint appendix. ECF 61-1, at 99–212.

at 46,480.[21] Commerce based its preliminary determination on the U.S. sales and factors of production databases Hung Vuong submitted during the review process in response to Commerce's questionnaires. ECF 61-1, at 691.

## 2. Commerce issued supplemental questionnaires and conducted verification in Vietnam.

Meanwhile, Catfish Farmers requested that Commerce verify Hung Vuong's questionnaire answers. ECF 61-1, at 1160. After Commerce issued its preliminary determination, but prior to verification, Catfish Farmers also asked Commerce to issue a supplemental questionnaire to probe Hung Vuong's relationship with its American customers, alleging that "the record evidence seriously calls into question whether [Hung Vuong's] sales with its U.S. customers constitute arm's-length transactions." *Id.* at 708–09.

Commerce then issued a supplemental questionnaire partially related to Hung Vuong's sales data and partially related to Hung Vuong's customers. The

---

[21] "When either a respondent's weighted-average dumping margin is zero or *de minimis*, or an importer-specific *ad valorem* assessment rate is zero or *de minimis*, Commerce will instruct CBP to liquidate appropriate entries without regard to antidumping duties." 83 Fed. Reg. at 46,480–81 (citing 19 C.F.R. § 351.106(c)(2)). Thus, under Commerce's preliminary determination, Hung Vuong's frozen fish fillets would have been subject to no antidumping duty at all, though they would still have been subject to normal import duties, if any, that would otherwise apply.

portion relating to customers directed Hung Vuong to respond to the questions or, if Hung Vuong were unable to do so, to forward the questions to the customers for responses. *Id.* at 753–61 (questionnaire). Hung Vuong responded to the sales data portion of the questionnaire, *id.* at 763–818, and forwarded the "customer" portion to its customers for their input, but many of the customers refused to respond in whole or in part, *id.* at 820–52 (redacted customer responses).

Commerce thereafter conducted verification in Vietnam. Before doing so, Commerce provided Hung Vuong a detailed outline of the matters the agency expected to examine and the types of documents Commerce would ask to review. *See id.* at 854–71.

### 3. Commerce issued its final decision and assigned Hung Vuong a $3.87/kg dumping margin after applying facts available with an adverse inference.

After verification, the parties submitted briefing, and then Commerce rendered an "issues and decision memorandum" assigning Hung Vuong an antidumping duty rate of $3.87 per kilogram. *See Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Issues and Decision Memorandum for the Final Results of the Fourteenth Antidumping Duty Administrative Review: 2016–2017* (Apr. 29, 2019), ECF 25-5, at 37.[22]

---

[22] Commerce also published the results of this final decision in the Federal Register. *See Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Final Results, and Final Results of No Shipments of the Antidumping*

In reaching this determination, Commerce first addressed four principal issues: (1) Hung Vuong's failure to retain source documents, ECF 25-5, at 18–24; (2) Hung Vuong's customer relationships, *id.* at 25–29; (3) Hung Vuong's control number reporting, *id.* at 29–32; and (4) the accuracy of Hung Vuong's factors of production, *id.* at 32–36. As to each of these issues, Commerce determined that the administrative record was deficient for various reasons, which warranted using "facts otherwise available" to complete the record pursuant to 19 U.S.C. § 1677e(a), *and* that Hung Vuong had failed to cooperate to the best of its ability to complete the record, which in turn warranted using an inference that is adverse to the interests of Hung Vuong "in selecting among the facts otherwise available." 19 U.S.C. § 1677e(b)(1)(A).

Commerce then applied "total AFA," trade law jargon for total "adverse facts available." ECF 25-5, at 35–36; *see also supra* Statutory and Regulatory Background at B.4.a.–b. (explaining "AFA"). In selecting among facts otherwise available, Commerce used an adverse inference by exercising its discretion under the statute to apply the highest antidumping margin previously applied under authority of the original 2003 antidumping order, $3.87 per kilogram. *See* ECF 25-5, at 36–37.

---

*Duty Administrative Review; 2016–2017*, 84 Fed. Reg. 18,007 (Dep't Commerce Apr. 29, 2019).

## B. This Lawsuit

In response to Commerce's final decision imposing a $3.87-per-kilogram antidumping margin, Hung Vuong commenced this litigation. ECF 1. Its complaint asks the Court to reject Commerce's final decision as "not supported by substantial evidence and otherwise not in accordance with law," ECF 10, at 19, and remand the matter to Commerce for further proceedings. *Id*.

Catfish Farmers intervened as of right to defend Commerce's final decision. ECF 19. Thereafter, Hung Vuong moved to require Commerce to add additional documents to the administrative record, including correspondence between members of Congress and Commerce and narrative materials Hung Vuong provided to Commerce during verification. ECF 29. In response, the government acknowledged the omissions, ECF 33, and the Court granted the motion, ECF 34.

Hung Vuong then filed the pending motion for judgment on the agency record. ECF 38; *see also* USCIT R. 56.2. After full briefing and oral argument, Hung Vuong submitted certain additional record materials in response to a question the Court asked during argument. *See* ECF 69 (public); ECF 68 (confidential).

### Jurisdiction and Standard of Review

Hung Vuong brings this suit under 19 U.S.C. § 1516a(a)(2)(A)(i)(I), (a)(2)(B)(iii). The Court has subject-matter jurisdiction over such actions pursuant to 28 U.S.C. § 1581(c).

Court No. 19-00055                              Page 30

In actions brought under 19 U.S.C. § 1516a(a)(2),
"[t]he court shall hold unlawful any determination,
finding, or conclusion found . . . to be unsupported by
substantial evidence on the record, or otherwise not in
accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).
That is, the question is not whether the Court would
have reached the same decision on the same record—
rather, it is whether the administrative record as a
whole permits Commerce's conclusion.

> Substantial evidence has been defined as more
> than a mere scintilla, as such relevant evidence
> as a reasonable mind might accept as adequate
> to support a conclusion. To determine if substan-
> tial evidence exists, we review the record as a
> whole, including evidence that supports as well
> as evidence that fairly detracts from the sub-
> stantiality of the evidence.

*Nippon Steel Corp. v. United States*, 337 F.3d 1373,
1379 (Fed. Cir. 2003) (cleaned up).

## Analysis

### I. Hung Vuong Fails to Overcome the Pre-
### sumption That Commerce Acted in Good
### Faith.

Hung Vuong asserts that after Commerce's prelim-
inary determination initially assigned Hung Vuong an
antidumping margin of zero, Commerce "reversed its
position in response to . . . congressional pressure."
ECF 38-1, at 18. Hung Vuong contends Commerce's

volte-face after such congressional intervention amounts to bad faith. *Id*. at 19.[23]

The administrative record shows that members of Congress pressured Commerce about this case[24] and that Commerce failed to memorialize that pressure in the administrative record as required by law.[25] The

---

[23] This issue was not raised in Hung Vuong's complaint as a ground for relief. Hung Vuong later moved to supplement the administrative record to reflect communications between members of Congress and Commerce, *see* ECF 28 (confidential motion); ECF 29 (public motion), but never moved to amend its complaint to assert bad faith as a ground for relief. Nevertheless, the government and Catfish Farmers do not object to Hung Vuong's raising the issue now. Rule 15(b)(2) provides that "[w]hen an issue not raised in the pleadings is tried by the parties' express or implied consent it will be treated in all respects as if it had been raised in the pleadings," and while a party may move for leave to amend, "failure to amend does not affect the result of the trial of that issue." USCIT R. 15(b)(2). There is no reason to apply a different principle to consideration of a dispositive motion, so the Court will consider Hung Vuong's bad faith claim as if it had been raised in the complaint.

[24] *See* ECF 61-1, at 750–51; *id.* at 900. Most notably, a group of senators sent a letter to the Secretary of Commerce asking him to make sure his personnel conducted Hung Vuong's verification "rigorously." *Id.* at 750.

[25] *See* 19 U.S.C. § 1677f(a)(3)(B) ("[Commerce] shall maintain a record of any ex parte meeting between— . . . (B) the person charged with making the determination, or any person charged with making a final recommendation to that person, in connection with that proceeding, if information relating to that proceeding was presented or discussed at such meeting. The record of such an ex parte meeting shall

question is whether those facts have any legal signifi-
cance.

The D.C. Circuit, with its heavy administrative law
docket, has a body of case law on this subject. Notably,
ex parte communications do not automatically void an
agency decision. Rather, the decision is *voidable* if the
reviewing court finds the agency process to be so "ir-
revocably tainted" as to make the agency's decision un-
fair, "either to an innocent party or to the public inter-
est that the agency was obliged to protect." *PATCO v.
Fed. Labor Relations Auth.*, 685 F.2d 547, 564 (D.C.
Cir. 1982).

It is also important to consider whether the party
allegedly aggrieved by the communications can
demonstrate prejudice and can identify what argu-
ments the party would have made had the communi-
cations been disclosed. *See id.* at 572. Ultimately, "ab-
sent a strong showing to the contrary, an agency adju-
dicator is presumed to act in good faith and to be capa-
ble of ignoring considerations not on the record." *Id.*
at 573 (cleaned up); *cf. Am-Pro Prot. Agency, Inc. v.
United States*, 281 F.3d 1234, 1239–40 (Fed. Cir. 2002)
(discussing presumption that government officials act
in good faith and requiring clear and convincing evi-
dence to show otherwise).

---

include the identity of the persons present at the meeting,
the date, time, and place of the meeting, and a summary of
the matters discussed or submitted. The record of the ex
parte meeting shall be included in the record of the pro-
ceeding.").

Here, the Court agrees with Hung Vuong that Commerce breached its statutory obligation to memorialize its communications with third parties in the administrative record. *See supra* note 25. Commerce communicated with members of Congress shortly before verification but failed to place anything on the record reflecting those communications until August 12, 2019, almost four months after Commerce issued its final decision. *See* ECF 61-1, at 1074–92. Moreover, Commerce only placed the information on the record after Hung Vuong learned of the communications and moved the Court for an order directing Commerce to supplement the record. Commerce's actions certainly create an appearance of impropriety.

That said, "appearance of impropriety" is not the applicable standard the Court must apply—rather, the question is whether Hung Vuong has clearly and convincingly demonstrated that Commerce's proceedings were so "irrevocably tainted" as to make the agency's decision unfair, *PATCO*, 685 F.2d at 564, or otherwise demonstrated prejudice resulting from the ex parte communications. *Id.* at 572.

Hung Vuong has not carried that heavy burden. First, although members of Congress did request that Commerce conduct its review "rigorously," there is no evidence in the administrative record to suggest that Commerce's procedures in this case were any more or less "rigorous" than in other cases or that Commerce's officials were so wholly cowed by Congress that they acted as Congress wished and disregarded the administrative record.

Court No. 19-00055                    Page 34

Second, Commerce's failure to memorialize its communications with members of Congress simply has no bearing on whether substantial evidence in the administrative record permitted Commerce to apply facts otherwise available and to do so with an adverse inference. As explained below, the Court concludes that substantial evidence mostly (but not entirely) supports Commerce's conclusions.

Finally, Hung Vuong's counsel could not say what his client would have done had Commerce timely updated the administrative record to reflect communications from members of Congress. ECF 70, at 21:2–23:4. That is, Hung Vuong cannot point to any prejudice resulting from Commerce's failure to update the administrative record in real time to reflect those communications.

In sum, even though Commerce's failure to timely memorialize the congressional communications in the administrative record is inexcusable and reflects poorly on the Department, Hung Vuong has not shown any evidence at all—let alone clear and convincing evidence—that Commerce based its final decision on those communications rather than on the administrative record or that Hung Vuong was somehow thereby prejudiced. Accordingly, Hung Vuong has not carried its burden of rebutting the presumption of good faith that attaches to official action.

## II. The Court Sustains in Part and Remands in Part Commerce's Determination to Apply Facts Otherwise Available with an Adverse Inference.

The second principal issue before the Court is whether substantial evidence in the administrative record permitted Commerce to apply facts otherwise available with an adverse inference to Hung Vuong.

Commerce concluded that the administrative record's deficiencies were so "pervasive and persistent" as to prevent Commerce from using the record at all, and further concluded that these deficiencies resulted from Hung Vuong's "failure to cooperate." ECF 25-5, at 35–36. In light of these findings, Commerce applied "total [adverse facts available]" because "it would be unduly difficult to apply partial [adverse facts available] by selecting from the facts available to remedy each of the deficiencies that impact each sale." *Id.* at 36. Commerce then used the highest margin applied in a previous review of the 2003 antidumping order and currently in effect, $3.87 per kilogram, and applied this rate to Hung Vuong. *Id.* at 36–37.

The Court addresses in turn each of the four categories of record deficiencies found by Commerce and then addresses Commerce's decision to apply "total adverse facts available."

### A. Failure to Retain Source Documents[26]

Commerce found that Hung Vuong discarded "documents kept in the normal course of business." ECF 25-5, at 18 (title case removed). Commerce explained that Hung Vuong is an experienced respondent[27] represented by experienced counsel and should therefore "be expected to maintain essential records concerning the production of frozen fish fillets and be able to respond to Commerce's reporting requirements." ECF 25-5, at 18. "During verification, Commerce discovered that [Hung Vuong] did not maintain source documents beyond a few months for certain key areas of inquiry during verification. Specifically, [Hung Vuong] stated that it does not maintain source documents for farming feed consumption, production

---

[26] This discussion corresponds to Commerce's findings in ECF 25-5, at 18–24.

[27] Commerce noted that Hung Vuong member Agifish was a mandatory respondent in the antidumping investigation conducted in connection with the original 2003 order and that Commerce had conducted verification of Agifish's questionnaire answers; Commerce also noted that Agifish had been a separate rate respondent in three administrative reviews. Commerce further noted that Hung Vuong—which included Agifish—was a mandatory respondent in the 9th, 10th, and 11th administrative reviews and underwent verification in the 11th review. "As such, because [Hung Vuong] or one of its collapsed members, Agifish, have been respondents in many administrative reviews and the investigation, and in several of those segments were verified, thus [Hung Vuong] is an experienced respondent." ECF 25-5, at 18–19.

orders related to its [period-of-review] sales, and sales correspondence emails." *Id.* at 19.

## 1. Commerce's findings

### a. Feed consumption

Commerce explained that fish feed, a producer's largest farming cost, is a critical factor of production for respondents. ECF 25-5, at 19. Accordingly, Commerce's questionnaire sought specific data and documentation showing, essentially, how much fish feed Hung Vuong used and what that fish feed cost. *Id.*; *see also* ECF 61-1, at 205–06 (Appendix X questions 15–25). Commerce also asked for further fish feed data in a supplemental questionnaire. ECF 25-5, at 19. "An examination of [Hung Vuong's] responses to these questions shows that [Hung Vuong] provided monthly summary charts of feed inventory and usage, purchase invoices and daily inventory in and out records." *Id.*

During verification, however, Commerce discovered a problem:

It was unexpected, therefore, that when attempting to examine the source documents kept by [Hung Vuong] in the normal course of business [Hung Vuong] announced it had discarded its fish feed source documents and only kept the monthly summary sheets for Commerce to examine. In fact, [Hung Vuong] stated that it only keeps such source documents for a few months before discarding them. This is in sharp contrast to other [factors of production] that Commerce examined at verification, where [Hung Vuong]

did keep various original source documents. For example, [Hung Vuong] retained source documents for the Daily Production Report consistent with the narrative from its questionnaire responses. *It is also in sharp contrast to its answers in its questionnaire responses, where it stated it kept such records for many years.*

*Id.* (cleaned up and emphasis added).

### b. Production records

Commerce noted that in prior administrative reviews of the Vietnamese frozen fish antidumping order, the agency has emphasized that respondents must report their information on a control number–specific basis.[28] Moreover, Commerce noted that in the

---

[28] Commerce has enforced its control number reporting requirement since at least the 8th administrative review. *See An Giang*, 287 F. Supp. 3d at 1369. The Department includes references to control number reporting in the standard non-market economy questionnaire template posted on its website. *See* https://enforcement.trade.gov/question naires/nme/20131101/q-rev-nme-20131101.pdf at A-5 & n.8, C-5, D-2, D-6, and E-7 (accessed Nov. 17, 2020).

The cover letter accompanying the initial questionnaire in the 14th review now before the Court admonished respondents to comply with the control number requirement, with the following sentence italicized in its entirety: "Accordingly, the Department is again reminding respondents that the [factors of production] reported in your submitted Section D must be reported on a [control number–]specific basis, as outlined in the reporting requirements of this questionnaire." ECF 61-1, at 101 (italics removed). The referenced Section D of the questionnaire Commerce sent to the respondents echoed the reminder quoted above, and the

11th administrative review Commerce applied facts
otherwise available (but not an adverse inference) to
Hung Vuong "for failing to report [factors of produc-
tion] on a [control number–]specific basis that re-
flected its production of fillet types it sold to the United
States during the [period of review], and failing to re-
port [factors of production] that accurately accounted
for the water soaking levels of the fillets they sold to
the United States." ECF 25-5, at 20.

In the current (14th) review, Commerce's reliance
on the control number methodology prompted the
agency to send Hung Vuong supplemental question-
naires that, *inter alia*, asked that control number–spe-
cific data be tied to source documents. *Id.* at 20–21.
Hung Vuong's responses said the production process
began with whole live fish and that the only produc-
tion-related documents the company produced were a
"Daily Production Report" and a "finished goods inven-
tory report." *Id.* at 21.

At verification, Commerce learned that Hung
Vuong's production process actually begins with a
"production order" instructing each factory on the
quantity and specifications to be produced, but when
Commerce asked to examine these documents, com-
pany officials said they discard production orders.
"Although in its questionnaire responses [Hung

---

questionnaire also emphasized that the respondent must
provide information about the quantity and value of all fac-
tors of production, *id.* at 194–95, and contained a series of
questions tying factors of production to control numbers,
*id.* at 204–05, 208.

Vuong] stated that its [sic] keeps this type of original production source documents [sic] for many years, in the end, Commerce was unable to examine any production orders at verification. This is in sharp contrast to other production documents Commerce examined at verification, where [Hung Vuong] did keep various source documents." *Id.* (cleaned up).

### c. Sales correspondence

Commerce observed that "[a]s an experienced respondent which has undergone verification before, [Hung Vuong] is well aware that for many, many years the verification outline has stated that . . . Commerce will examine sales negotiation correspondence." ECF 25-5, at 22. During verification, however, Commerce learned Hung Vuong deletes sales confirmation e-mails after a few months to save server space and to "reduce clutter" in the company's records, and Commerce also learned Hung Vuong deleted the entirety of one salesperson's e-mail correspondence when she left the company. *Id.* Accordingly, Commerce was "unable to verify the negotiation of prices, quantities, and terms of sales because [Hung Vuong] deleted the emails that would have provided this information." *Id.*

**2. The administrative record permitted Commerce to apply facts otherwise available with an adverse inference as to the failure to retain source documents.**

**a. Facts otherwise available**

Based on the foregoing source document deficiencies, Commerce concluded that necessary information was missing from the administrative record for purposes of 19 U.S.C. § 1677e(a)(1), ECF 25-5 at 23, and that by discarding source documents for fish feed, production records, and sales negotiation e-mails, Hung Vuong withheld requested information for purposes of 19 U.S.C. § 1677e(a)(2)(A), significantly impeded Commerce's investigation for purposes of 19 U.S.C. § 1677e(a)(2)(C), and provided information that could not be verified for purposes of 19 U.S.C. § 1677e(a)(2)(D). *Id.* at 22–24. Any *one* of these four findings allowed Commerce to apply "facts otherwise available" under 19 U.S.C. § 1677e(a).[29]

---

[29] At oral argument, Hung Vuong's counsel conceded that source documents had been discarded but disputed whether any of that information mattered. ECF 70, at 11:25–12:23. Hung Vuong's briefing likewise argues that the missing source documents were not, in Hung Vuong's opinion, "necessary" information, asserting that the absence of "necessary" information is "required" before Commerce can resort to facts otherwise available. *See, e.g.*, ECF 58, at 13–14. Hung Vuong overlooks the statute's use of the disjunctive "or." As discussed above, *see supra* Statutory and Regulatory Background Part B.4.a., the "facts otherwise available" statute is a multi-layered provision

Here, the Court need not address each statutory basis invoked by Commerce to apply facts otherwise available, as substantial evidence permitted Commerce's conclusion that Hung Vuong provided information that "cannot be verified." 19 U.S.C. § 1677e(a)(2)(D). It is undisputed that Hung Vuong did not retain source documents for fish feed consumption, production orders related to control numbers during the period of review, and sales correspondence e-mails. *See, e.g.*, ECF 38-1, at 33 (Hung Vuong admission that it routinely "discards" source documents).

Commerce sought this source document information precisely to verify Hung Vuong's responses to Commerce's initial and supplemental questionnaires. Because the discarded source documents prevented verification, Commerce permissibly applied facts otherwise available. *See, e.g.*, *Yantai Timken Co. v. United States*, 521 F. Supp. 2d 1356, 1375 (CIT 2007) (Commerce permissibly "resort[ed] to facts available" when respondent "supplied information regarding rebates and commissions that could not be verified and further

_____

that uses the word "or" multiple times, such that any one (or more) of the enumerated conditions is an independent basis for Commerce to apply facts otherwise available. One such ground is when "*necessary* information is not available *on the record*." 19 U.S.C. § 1677e(a)(1) (emphasis added). Another such ground, however, is when a respondent provides "information [requested by Commerce] but the information *cannot be verified*." 19 U.S.C. § 1677e(a)(2)(D) (emphasis added). As discussed below, the problem here is that Hung Vuong's discarding of source documents prevented verification of information in the administrative record.

failed to provide source documents requested by Commerce").

This is so even though Hung Vuong offered secondhand "summary reports" purporting to reflect information in original source documents. As the Federal Circuit has noted, Commerce is entitled to insist on the original records because "failure to submit primary source documentation" means that Commerce is "unable to verify the accuracy of the information submitted." *Thyssen Stahl AG v. AK Steel Corp.*, No. 97-1509, 1998 WL 455076, at *5 (Fed. Cir. July 27, 1998) ("Thyssen's internally generated commercial invoices . . . presumably depended upon information contained in actual source documents, but the internally generated documents cannot, for the purpose of verification, replace the actual source documents.").

Finally, § 1677e(a) provides that Commerce's resort to "facts otherwise available" for deficiencies in the administrative record is "subject to section 1677m(d) of this title." 19 U.S.C. § 1677e(a). Section 1677m(d) provides that if Commerce "determines that a response to a request for information under this subtitle does not comply with the request," Commerce must "promptly inform the person submitting the response of the nature of the deficiency and shall, to the extent practicable, provide that person with an opportunity to remedy or explain the deficiency in light of" the applicable time limits. 19 U.S.C. § 1677m(d).

Here, as the government's counsel noted at oral argument, Hung Vuong's admission that the source documents no longer existed made it impracticable for

Court No. 19-00055                                    Page 44

Commerce to give Hung Vuong a chance to supple-
ment the record. ECF 70, at 64:9–65:23. As Hung
Vuong had discarded the relevant source documents,
it would have been futile for Commerce to give Hung
Vuong another chance to produce them. *Cf. Ta Chen
Stainless Steel Pipe, Inc. v. United States*, 298 F.3d
1330, 1338 (Fed. Cir. 2002) ("[Section 1677m(d)] only
applies when a 'response to a request' is deemed to not
comply. A failure to respond is not the same as a 're-
sponse' as required by the statute.").

More importantly, the Court construes § 1677m(d)
as inapplicable at the verification stage. Verification—
unlike Commerce's questionnaires sent to respondents
at the beginning of an investigation or an administra-
tive review—does not entail a "request for information
under this subtitle." 19 U.S.C. § 1677m(d). Instead,
verification entails "verify[ing] information" previ-
ously provided by a respondent in its questionnaire an-
swers. *Id.* § 1677m(i).

Thus, insofar as a respondent's questionnaire an-
swers on their face comply with Commerce's infor-
mation requests, § 1677m(d) does not apply if Com-
merce, upon verification, determines that those ques-
tionnaire answers are inaccurate. In short, verification
is not an opportunity for a do-over; instead, the pur-
pose of verification is to confirm information previ-
ously submitted by a respondent in response to Com-
merce's requests for information.

### b. Adverse inference

Commerce further determined that in applying facts otherwise available based on its inability to complete verification due to missing source documents, an adverse inference was warranted because Hung Vuong "failed to cooperate to the best of its ability." ECF 25-5, at 23; *see* 19 U.S.C. § 1677e(b)(1)(A) (permitting an adverse inference when "an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information").

Commerce reasoned that Hung Vuong, an experienced respondent, "*produces* the records sought by Commerce in the ordinary course of business, but chose to discard them so that Commerce would not be able to examine them at verification." ECF 25-5, at 23 (emphasis added). "To allow [Hung Vuong] to determine which source documents it will allow Commerce to examine at verification is to allow [Hung Vuong] to control this proceeding." *Id.*

Hung Vuong challenges Commerce's decision to apply an adverse inference, arguing that "there is nothing untoward or surprising about" Hung Vuong discarding records—Hung Vuong "explained to Commerce, on multiple occasions, that it does not always keep underlying source records once the information has been transferred to more regularized monthly or computerized records." ECF 38-1, at 29 (cleaned up). Hung Vuong further argues that Vietnamese fish producers often do not keep the sorts of records Commerce asked to review in this case. *Id.* at 30.

For purposes of whether Commerce permissibly applied an adverse inference based on Hung Vuong's failure to maintain source documents, the question here is whether Commerce has made "an objective showing that a reasonable and responsible importer would have known that the requested [source documents were] required to be *kept and maintained* under the applicable statutes, rules, and regulations." *Nippon Steel*, 337 F.3d at 1382 (emphasis added). Hung Vuong clearly *produced* source documents in the ordinary course of business, but would a reasonable and responsible producer have *retained* all such documents to respond to an investigation or verification by Commerce?

According to Commerce's final decision, "[w]hile courts have held the application of AFA impermissible where companies do not *keep* records in the ordinary course of business, this is not the case here." ECF 25-5, at 23 & n.176 (emphasis added and citing *F.lli De Cecco Di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027 (Fed. Cir. 2000), and *Borden, Inc. v. United States*, 4 F. Supp. 2d 1221, 1247 (CIT 1998)). There's a lot in that sentence, and the Court will attempt to unpack it.

First, neither cited decision even addresses, much less supports, the proposition that Commerce oddly attributes to both.[30] Nevertheless, the Court takes Commerce's statement as an admission by it that a "reasonable and responsible" producer is only obligated to

---

[30] Hung Vuong parrots verbatim Commerce's inaccurate characterization of *De Cecco*, down to the missing pincite. *See* ECF 38-1, at 33.

Court No. 19-00055                  Page 47

*retain* records that it keeps in the ordinary course. Consistent with that admission, Commerce's standard questionnaire instructions require respondents to "[i]dentify any source documents *maintained in the normal course of business* you have relied on in preparing your response, and specify the cities where these documents are maintained." *See* questionnaire cited *supra* note 28, at G-10 (emphasis added). Commerce is free to put respondents on notice that *all* (or some subset of) source documents must be retained, but Commerce has not done so (except as discussed below). Instead, as the questionnaire indicates, Commerce's generally applicable standard is whether source documents are "maintained *in the normal course of business.*"

Second, the Court does not understand Commerce's unexplained, if not incoherent, assertion that "this [impermissibly applying an adverse inference for failure to retain records in the ordinary course of business] is not the case here." Hung Vuong argues that the challenged source documents were *not* kept in the normal course of business, and Commerce did apply an adverse inference. So it *is* the case here that Commerce is applying an adverse inference based on the failure to keep records in the ordinary course of business. Under Commerce's own standard questionnaire instructions, Hung Vuong had no reason to expect that it had to retain *all* original source documents.

There is more to the matter, however, than simply the standard questionnaire instructions. Commerce also sent Hung Vuong a verification outline listing the "required source documents" Commerce would seek to

Court No. 19-00055                                    Page 48

examine during verification. *See, e.g.*, ECF 61-1, at 854. Commerce has used this verification outline "for many, many years." ECF 25-5, at 22.

The outline stated that Commerce wished to review, *inter alia*, "[p]urchase agreements and records of payment made for material costs, charges and expenses," "raw material inventory ledger[s]," and "[m]onthly records (for [period of review] of raw material consumption at each production center," ECF 61-1, at 858–59, material that necessarily included fish feed purchase records. Similarly, section XIII of the verification outline, headed "Material Inputs," explained that Commerce would thoroughly review the costs of producing the frozen fish fillets, including how Hung Vuong purchased raw materials from suppliers and "the amounts purchased for all factors," which in context clearly referred to factors of production such as fish feed. *Id.* at 867–68.

The verification outline also listed "[p]*roduction orders*," which Commerce said would "serve as substantiation for reported information about individual sales as well as total sales figures for the [period of review]." *Id.* at 858. As to sales correspondence, the outline stated that Commerce would " 'trace' the selected sale *from initial inquiry/order through your records to receipt of payment from the customer*," and that "*a complete set of documents should be prepared for [each selected] sale*." *Id.* at 864 (emphasis added).

Commerce's verification outline is why Hung Vuong's status as an "experienced respondent" matters. ECF 25-5, at 18–19. An inexperienced

respondent, or a respondent that had never been sub-ject to verification, would have received only the stand-ard questionnaire with the general instruction about "source documents maintained in the normal course of business" and thus may not have seen a need to retain all source documents, but an experienced respondent that had previously received the verification outline would know what types of source documents Com-merce would ask for at verification, such that it would be objectively unreasonable for the experienced re-spondent to assume that disposing of those materials was acceptable.

The Court therefore concludes, in view of this veri-fication outline—which imposed stricter source docu-ment retention obligations than Commerce's general instructions—that Hung Vuong, as an experienced re-spondent, "would have known that the requested [source documents] were required to be kept and main-tained under the applicable statutes, rules, and regu-lations." *Nippon Steel*, 337 F.3d at 1382. Substantial evidence therefore permitted Commerce to apply an adverse inference based on Hung Vuong's failure to re-tain these source documents, regardless of its business practices.[31]

---

[31] Notably, in litigation following Commerce's 11th admin-istrative review of the same antidumping order at issue in this case, Hung Vuong argued that it was impossible for it to comply with Commerce's data requests because it did not track sales and factors of production based on product char-acteristics identified by control numbers. Commerce re-jected that argument, finding Hung Vuong could still track information in the way Commerce requested even if that

Court No. 19-00055                                   Page 50

In addition, "a court may affirm the decision of an agency on a ground other than the ground given by the agency, so long as it is clear that the agency would have reached the same decision if it had been aware that the ground it invoked was legally unavailable, or if the decision does not depend on making a finding of fact not previously made by the agency." *Oracle Am., Inc. v. United States*, 975 F.3d 1279, 1291 (Fed. Cir. 2020). Here, if the Court were to find that Hung Vuong was not on notice of the need to maintain source documents, the Court would find that substantial evidence permitted Commerce's conclusion that Hung Vuong's questionnaire answers regarding the feed consumption and production record source documents were inaccurate. *See* ECF 25-5, at 19 (Hung Vuong's questionnaire answers inaccurately stated that feed consumption records were "kept for many years"); *id.* at 21 ("Although in its questionnaire responses HVG stated that it keeps this type of original production source documents for many years, in the end, Commerce was unable to examine any production orders at verification.").

Those findings in turn supported Commerce's conclusion that Hung Vuong failed to cooperate to the best

---

were not Hung Vuong's normal business practice. The Court agreed. *See An Giang*, 287 F. Supp. 3d at 1370–71. Commerce initiated the 11th review in 2014 and issued its final decision in 2016. *Id.* at 1364, 1365. Thus, Hung Vuong was on notice well prior to the 14th administrative review that Commerce would not accept the "not our business practice" argument, especially in view of *Nippon Steel*'s admonition that "inadequate record keeping" is inexcusable.

Court No. 19-00055                                   Page 51

of its ability. *See id.* at 23 (relying on all of "the above" findings to conclude that Hung Vuong did not cooperate to the best of its ability); *see also Nippon Steel*, 337 F.3d at 1383 ("[I]naccurate reporting[] surely evinces a failure to cooperate . . . .").

Accordingly, the Court determines that Commerce permissibly applied an adverse inference in connection with the missing feed consumption and production records documents. That inference was permissible even if Hung Vuong had not been on notice of the requirement to maintain the discarded source documents, because Hung Vuong's questionnaire answers about its document retention policies were inaccurate.

Finally, Hung Vuong also objects that Commerce has sometimes excused prior respondents' inadequate recordkeeping and asserts that Commerce's allegedly disparate treatment of Hung Vuong is an arbitrary change in policy. *See* ECF 38-1, at 33–34. Specifically, Hung Vuong cites a Commerce decision from the 8th review as to a different respondent. There, Commerce did not require the respondent to "keep or maintain certain records beyond which the Department had approved in prior segments, absent explicit evidence that would call into question the company's document retention system." *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Issues and Decision Memorandum for the Final Results of the Eighth Administrative Review and Aligned New Shipper Reviews*, at 45 (Mar. 13, 2013).

Commerce's final decisions in prior reviews do not "establish a policy" as Hung Vuong contends. "Each

administrative review is a separate exercise of Commerce's authority and allows for different conclusions based on different facts in the record. Commerce's findings with respect to [a respondent's] reporting methodology in prior segments of this proceeding do not relieve [any respondent] of its burden to comply with Commerce's requests in [a later] segment." *ABB Inc. v. United States*, 437 F. Supp. 3d 1289, 1301 (CIT 2020) (cleaned up); *see also Hyundai Heavy Indus. Co. v. United States*, 332 F. Supp. 3d 1331, 1342 (CIT 2018) (finding respondent could not excuse its failure to comply with Commerce's questionnaires by pointing to Commerce's treatment of that respondent's information in prior administrative reviews).

## B. Hung Vuong's Relationship with Customers[32]

Catfish Farmers contends that Hung Vuong may be affiliated with its U.S. customers.[33] Sales to an affiliated entity may not be at arm's length and thus may not reflect commercial reality.[34] Therefore, at oral

---

[32] This discussion corresponds to Commerce's findings in ECF 25-5, at 24–29.

[33] The statutory basis for this argument is 19 U.S.C. § 1677(33)(G), which provides: "The following persons shall be considered to be 'affiliated' or 'affiliated persons': . . . (G) Any person who controls any other person and such person. For purposes of this paragraph, a person shall be considered to control another person if the person is legally or operationally in a position to exercise restraint or direction over the other person."

[34] As previously discussed, antidumping duties are "equal to the amount by which the normal value exceeds the

Court No. 19-00055                                    Page 53

argument counsel for Catfish Farmers explained that if Hung Vuong is affiliated with its U.S. customers, it could potentially manipulate the sales price to receive a lower dumping margin than might otherwise be the case. ECF 70, at 81:25–84:20.

Prior to verification, Commerce issued supplemental questionnaires to both Hung Vuong and its customers in "an attempt to probe [Hung Vuong's] possible affiliation with these companies, the role of ex-employees at these companies, how [Hung Vuong] does business with these companies and whether the sales are made at arm's length, and information about sales to the ultimate purchasers, among other things." ECF 25-5, at 25.

---

export price (or the constructed export price) for the merchandise." 19 U.S.C. § 1673. The "export price" is the price the producer or exporter charges to an *unaffiliated* customer either within, or for exportation to, the United States, while the "constructed export price" is the price the *affiliated* purchaser charges within the United States to a purchaser not affiliated with the producer or exporter. *Mid Continent Steel & Wire, Inc. v. United States*, 203 F. Supp. 2d 1295, 1298–99 (CIT 2017). Commerce makes certain statutory adjustments to the price of goods to reflect various costs involved in preparing the goods for sale in the United States, and the adjustments to "constructed export price" are more extensive than the adjustments to "export price." *See* 19 U.S.C. § 1677a(c) (listing adjustments to both), (d) (listing additional adjustments to "constructed export price").

### 1. Commerce's findings

Commerce concluded that "three important pieces of information [were] missing from the record" for purposes of assessing the relationship between Hung Vuong and its customers. ECF 25-5, at 27. First, because Hung Vuong had deleted the e-mail messages containing sales correspondence with customers, that information was not in the record. *Id.* Second, Hung Vuong's customers did not respond to Commerce's questionnaires, and that information would have shed light on the affiliation issue. *Id.* Third, Hung Vuong failed to retain production orders, which would have shown specific details for particular sales. *Id.* at 27–28.[35]

---

[35] The Court pauses here to note that aspects of Commerce's final decision are incoherent and frustrate reasoned judicial review. For instance, Commerce at times characterizes Hung Vuong's action as "discarding" production orders, *see* ECF 25-5, at 23 (referring to Hung Vuong's "convenient discarding of these documents"), but elsewhere Commerce characterizes Hung Vuong's action as a "refusal to provide production orders requested at verification," *id.* at 27, and then later distinguishes between Hung Vuong's decisions to (1) "discard" e-mails and (2) "not provide" production orders, *id.* at 28. The Court cannot discern whether (1) this is simply sloppiness on Commerce's part, (2) the Department believes "discard" and "refusal to provide" mean the same thing, or (3) Commerce means to say that Hung Vuong *retained* production orders but refused to provide them. In any event, the Court construes Commerce's statements that Hung Vuong "refused to provide" production orders as meaning that Hung Vuong discarded them long before verification pursuant to its ordinary business practices.

In addition, Commerce noted Hung Vuong's questionnaire answers stated any interaction Hung Vuong had with its "downstream purchasers" (that is, the people who buy frozen fish from Hung Vuong's U.S. customers) was incidental, sporadic, and promotional in nature, but at verification Commerce found evidence of regular substantive visits by Hung Vuong to downstream purchasers and vice versa. *Id.* at 26.

**2. Commerce must reconsider its application of facts otherwise available with an adverse inference as to customer relationships.**

**a. Facts otherwise available**

Based on its findings described above, Commerce concluded that it did "not have the necessary information to determine the full extent of the relationship between [Hung Vuong] and its customers, including any potential affiliate relationship or any principal/agent relationship," *id.* at 27, and could not "determine whether [it] ha[d] a correct Section C database which would include the selling expenses incurred by [Hung Vuong's] U.S. selling agent, with which to calculate a margin for [Hung Vuong]." *Id.* at 28. The "scale of the problem" rendered Hung Vuong's responses unusable in determining "an accurate and reliable dumping margin." *Id.* at 28–29.

Commerce therefore applied facts otherwise available because (1) necessary information was not available on the record, *see* 19 U.S.C. § 1677e(a)(1); (2) Hung Vuong withheld information requested by

Commerce, *id.* § 1677e(a)(2)(A); (3) Hung Vuong significantly impeded Commerce's verification, *id.* § 1677e(a)(2)(C); and (4) Hung Vuong provided information that could not be verified, *id.* § 1677e(a)(2)(D). ECF 25-5, at 28. As above, any *one* of these four findings allowed Commerce to apply "facts otherwise available" under 19 U.S.C. § 1677e(a), and therefore the Court need not address every such finding so long as at least one of them is supported by substantial evidence.

At a minimum, substantial evidence permitted Commerce's conclusion that Hung Vuong submitted information that could not be verified due to Hung Vuong's failure to retain sales correspondence and production orders. Contrary to Hung Vuong's argument, *see* ECF 38-1, at 26, Commerce had no obligation under 19 U.S.C. § 1677m(d) to provide Hung Vuong an opportunity to cure these deficiencies. As explained above, § 1677m(d) does not apply at the verification stage, but even if it did, such an opportunity to cure would have been futile because the documents no longer existed.

On the other hand, Commerce could not lawfully rely upon the failure of Hung Vuong's customers to answer Commerce's questionnaire as a basis to apply facts otherwise available when Commerce gave no notice of the deficiency. As Hung Vuong points out in its brief, it first learned of this deficiency when Commerce issued its final decision some four months after Hung Vuong submitted its questionnaire answers. *See* ECF 38-1, at 26. The government has no response to this argument. On remand, therefore, Commerce must

reconsider its decision to apply facts otherwise available as to customer relationships and determine whether it should apply partial facts available.

Commerce further cited discrepancies between information in Hung Vuong's questionnaire answers about its contact with customers and their ultimate purchasers and information discovered at verification suggesting more systematic and pervasive contact. ECF 25-5, at 26–27. For example, the questionnaire response stated Hung Vuong does not discuss "price negotiation, delivery, or negotiation of other terms or conditions of U.S. sales with the ultimate U.S. purchasers," ECF 61-1, at 778–79, but e-mail correspondence found at verification indicated otherwise, ECF 25-5, at 26. The questionnaire response also stated Hung Vuong's officials did not visit customers' ultimate purchasers, aside from sometimes being introduced to them at trade fairs, ECF 61-1, at 778, but at verification Commerce learned Hung Vuong officials directly visited the ultimate purchasers, ECF 25-5, at 26 (citing ECF 61-1, at 909). The verification report noted those visits with ultimate purchasers might include discussion of "possible sales, products, [and] prices." ECF 61-1, at 909.

Hung Vuong's briefing contends there was no discrepancy because the company disclosed that its officers visited customers and customers visited Hung Vuong, *see* ECF 38-1, at 26, but the questionnaire response also said Hung Vuong did not visit the *ultimate purchasers* (i.e., the customers' customers) and the information found at verification contradicted that. ECF 25-5, at 26 (citing ECF 61-1, at 909).

In short, discrepancies in the administrative record between Hung Vuong's questionnaire answers versus the information revealed at verification supported Commerce's decision to apply facts otherwise available due to its inability to verify information in the record and Hung Vuong's impeding of the investigation. Although Hung Vuong complains that it was not provided an opportunity to cure this deficiency pursuant to 19 U.S.C. § 1677m(d), as discussed above, the Court construes that provision as inapplicable to deficiencies discovered at verification. In any event, Commerce's obligation to provide that opportunity is subject to "the time limits established for the completion of investigations or reviews under this subtitle." 19 U.S.C. § 1677m(d). In this case, verification concluded less than one month prior to Commerce's statutory deadline.

Hung Vuong's reply brief, however, argues that Commerce should have notified Hung Vuong of the deficiencies *prior to verification* because "it had much of [Hung Vuong's] purportedly deficient information in its possession for several months (and in some cases more than a year)." ECF 58, at 9. Nothing in the record suggests Commerce was aware that Hung Vuong's questionnaire answers were inaccurate until verification, and Hung Vuong has offered no argument whatsoever to demonstrate how or why Commerce should have discovered those deficiencies sooner.

If Commerce does not know responses are unverifiable until it conducts verification—after all, what else is verification for?—then how is Commerce supposed to give notice of a deficiency it has not yet discovered?

*Cf. Taian Ziyang Food Co. v. United States*, 637 F. Supp. 2d 1093, 1112 (CIT 2009) (accepting the government's argument that Commerce could not have informed a party that information was missing from the administrative record when Commerce did not yet know the information submitted was incorrect).

\* \* \*

The Court largely sustains Commerce's decision to find facts otherwise available as to Hung Vuong's customer relationships, but on remand Commerce must reconsider whether to apply partial facts available because it could not lawfully apply facts otherwise available based on the failure of Hung Vuong's customers to answer Commerce's questionnaires. In so doing, Commerce must thoroughly explain why it reaches whatever decision it makes.

### b. Adverse inference

The second part of the analysis, as above, involves Commerce's decision to apply an adverse inference. Commerce found that Hung Vuong failed to cooperate to the best of its ability in responding to Commerce's requests for information because Hung Vuong discarded sales correspondence and production orders, thereby "preclud[ing] Commerce from further probing [Hung Vuong's] relationships with its customers." ECF 25-5, at 28. Commerce concluded that Hung Vuong's failure to cooperate resulted in Commerce being unable to determine whether the administrative record provided adequate information about Hung Vuong's selling expenses from which Commerce could

calculate a dumping margin for Hung Vuong. *Id.* at 28–29.

Again, the standard is that enunciated in 19 U.S.C. § 1677e(b)(1) as further clarified by *Nippon Steel*—whether the respondent (here, Hung Vuong) failed to cooperate to the best of its ability—and, again, the analysis has no *mens rea* component. The same problem with the data supporting Hung Vuong's factors of production arises as to the records Commerce sought to review regarding Hung Vuong's relationship with its customers. Hung Vuong discarded production orders and e-mail correspondence with its customers and, apparently (based on records found at verification), those customers' ultimate purchasers. As the *Nippon Steel* court noted, the "best of its ability" standard does not permit "inadequate record keeping." 337 F.3d at 1382. Hung Vuong does not dispute that it routinely deletes production orders and e-mail correspondence—rather, Hung Vuong almost defiantly admits that it does so and then disparages Commerce for requesting material Hung Vuong considers "not relevant." ECF 58, at 17.

Moreover, while Hung Vuong contends that discarding production orders and deleting e-mail is a "typical business practice," *id.*, Hung Vuong fails to address how such discarding of source documents Commerce deems relevant can possibly comply with the *Nippon Steel* standard when Commerce's verification outline requires such data. Therefore, the Court concludes that substantial evidence in the administrative record permitted Commerce to apply an adverse inference as to Hung Vuong's relationship with its

customers based on its failure to retain production or-
ders and e-mail correspondence with its customers.

Similarly, the Court concludes that substantial ev-
idence supported Commerce's determination to apply
an adverse inference based on Hung Vuong's submis-
sion of inaccurate questionnaire answers regarding its
relationship with downstream customers. These inac-
curate responses amounted to a failure to cooperate for
purposes of 19 U.S.C. § 1677e(b)(1). However, because
the Court is remanding for Commerce to reconsider
whether to use total or partial facts available for the
reasons noted above, the Court is also required to re-
mand the decision to apply an adverse inference—re-
gardless of whether substantial evidence in the admin-
istrative record permitted that decision—because
19 U.S.C. § 1677e(b)(1)(A) allows Commerce to apply
an adverse inference only for purposes of "selecting
from among the facts otherwise available." Thus, if
Commerce decides to use partial facts available on re-
mand, Commerce could only apply (at most) a partial
adverse inference. On remand, therefore, after recon-
sidering whether to apply partial facts available on the
customer relationships issue, Commerce must also re-
consider whether to apply an adverse inference—in
whole or in part—on the issue and must thoroughly
explain why it reaches whatever decision it makes.

## C. Control Number Reporting[36]

### 1. Commerce's findings

As discussed above, *see supra* Statutory and Regulatory Background Part C.2., Commerce requires respondents to use a reporting mechanism referred to as "control numbers." In this case, Commerce found that Hung Vuong failed to comply with the control number methodology:

> At verification, we observed that [Hung Vuong's] invoices, rather than reflecting the actual [control numbers] produced, instead represent an average of several [control numbers]. More specifically, an examination of the Daily Production Report indicates that for each sale, production occurs over several days, and at the end of an order, [Hung Vuong] sums up the unsoaked and soaked fillet weights to calculate an average NETWGTU for that particular sale. The value reflected in the invoice is therefore an average of all the productions [sic] runs for that sale.

ECF 25-5, at 30.

The Court understands "NETWGTU" as having something to do with the amount of water weight the fish fillets gain when they are soaked in preservatives. Commerce emphasized that producers must accurately report this weight gain "in the [control number] in the field 'NETWGTU,'" *id.*, but found that Hung

---

[36] This discussion corresponds to Commerce's findings in ECF 25-5, at 29–32.

Court No. 19-00055                    Page 63

Vuong only reported average numbers, "rather than the precise amount of water weight gained by fillets during each production run." *Id.* Commerce also found that Hung Vuong had records that would have allowed it to comply with Commerce's required methodology. *Id.* at 31.[37]

Commerce's review of Hung Vuong's invoices at verification indicated that "an examination of the daily production shows that rounding each day's production to the nearest decimal results in the same NETWGTU for each line item as well as the report's total, and therefore, for the entire sale." *Id.* at 30. Commerce noted that in this circumstance, reporting one control number for the whole invoice was accurate, but Commerce then explained that this method would not always work: "However, for other sales, for example the first surprise sales trace, an examination of the daily production report shows that rounding the daily production to the nearest decimal results in five different NETWGTUs, and therefore, five [control numbers] should have been reported, but [Hung Vuong] only reported one [control number] for the sale." *Id.*

---

[37] The Court further notes that at oral argument, Hung Vuong's counsel said it would have been easy for the company to report data in the way Commerce required because it would have essentially just required hitting "a few buttons" on the company's computer system. ECF 70, at 40:3–42:4. If indeed it would have been "easy" for the company to comply, then the Court cannot understand why Hung Vuong didn't just follow Commerce's instructions in the first place.

Hung Vuong's response was essentially to argue that Commerce's requirements were too difficult, but Commerce found that Hung Vuong's records would have allowed for reporting in the required manner. *Id.* at 30–31. "Put another way, [Hung Vuong] has not re-ported [control number–]specific sales data as re-quired by Commerce's repeated warnings in this case, and Commerce's instructions." *Id.* at 31. Commerce ex-plained that this matters because "allocation method-ologies that average [control number] characteristics may result in a reporting methodology that is not ac-curate because there is less variation in the calculation of [normal value], even though there are clear differ-ences in the physical characteristics of the [control numbers] and in the actual amount of inputs used." *Id.*

### 2. The administrative record permitted Commerce to apply facts otherwise available with an adverse inference as to control number reporting.

### a. Facts otherwise available

Based on the foregoing, Commerce invoked 19 U.S.C. § 1677e(a)(2)(B), (C), and (D) and stated that "because [Hung Vuong] did not report accurate [con-trol numbers] when it had the ability to do so, we find that [Hung Vuong] failed to provide sales and [factors-of-production] data in the form or manner requested by Commerce and significantly impeded this proceed-ing." ECF 25-5, at 32. Commerce found that the ab-sence of properly-reported data meant that "we do not have correct Section C and Section D databases with which to calculate an accurate margin for [Hung

Vuong]. Commerce therefore cannot use [Hung Vuong's] Section C and Section D questionnaire responses to determine an accurate and reliable dumping margin." *Id.* As before, any one of the three statutory grounds—§ 1677e(a)(2)(B), (C), *or* (D)—is enough to require Commerce to use facts otherwise available.

### i. (a)(2)(B)—failure to provide information in the form and manner requested.

The Court concludes that substantial evidence permitted Commerce's decision to resort to facts otherwise available pursuant to § 1677e(a)(2)(B) because it is essentially undisputed that Hung Vuong failed to report its control numbers in the manner Commerce required and because neither of the two exceptions under § 1677m apply here.[38]

Commerce explained that Hung Vuong "reported the weighted average of the production runs for an invoice, rather than the precise amount of water weight gained by fillets during each production run." ECF 25-5, at 30. Hung Vuong objects to this finding and argues that the company reported data "based on actual water weight gain attributed to each specific production run using its actual production records . . . ." ECF 38-1, at 36. Hung Vuong spends roughly

---

[38] Section 1677e(a)(2)(B) requires Commerce to use facts otherwise available when an interested party "fails to provide such information [requested by Commerce] by the deadlines for submission of the information or in the form and manner requested, subject to subsections (c)(1) and (e) of [19 U.S.C. § 1677m]." 19 U.S.C. § 1677e(a)(2)(B).

three pages of its brief asserting, in various ways, that it used "actual water weight gain" in its reporting. *See id.* at 36–38.

However, it appears to the Court that Hung Vuong and Commerce are talking past each other. Commerce's findings do not appear to the Court to contend that Hung Vuong did not use "actual water weight gain." Rather, it appears to the Court that Commerce's complaint is that Hung Vuong took the "actual water weight gain" for multiple fish fillets and then averaged all the data to report a single control number, instead of reporting figures for each specific control number that should have applied to the finished fish fillets: "More specifically, an examination of the Daily Production Report indicates that for each sale, production occurs over several days, and at the end of an order, [Hung Vuong] sums up the unsoaked and soaked fillet weights *to calculate an average* NETWGTU for that particular sale. *The value reflected in the invoice is therefore an average of all the productions [sic] runs for that sale.*" ECF 25-5, at 30 (emphasis added). Commerce's complaint is that Hung Vuong should have reported separate data for each production run, rather than averaging the data. Notably, Hung Vuong admits to doing this and says it "does not dispute that it used an 'averaging' methodology to report its net weights." ECF 38-1, at 39.

The requirement that Hung Vuong comply with the "control number" reporting methodology is not new and should not have been a surprise to Hung Vuong. As noted above, *see supra* note 31, the *An Giang* Court previously found that Commerce emphasized the

control number requirements at least as early as the 8th administrative review, such that by the time of the 11th review, Hung Vuong was "notified of Commerce's preference for [control number–]specific reporting and had enough time to come into compliance." *An Giang Fisheries Import & Export Joint Stock Co. v. United States*, 287 F. Supp. 3d 1361, 1369–70 & n.13 (CIT 2018); *see also id.* at 1370 ("Given the advance notice afforded to respondents, the court cannot find that Commerce's request for [control number–]specific reporting, here, was unreasonable . . . .").

The *An Giang* Court also found that while Hung Vuong did not track sales and factors of production based on the product characteristics identified by the control numbers, Commerce was justified in expecting Hung Vuong to track information in the way Commerce required, regardless of what sort of records Hung Vuong kept in the "normal course of business." *Id.* at 1370–71 (cleaned up). The government notes that in the course of this 14th administrative review, Commerce again placed great emphasis on the importance of its required "control number" reporting methodology. ECF 49, at 26–28, 37–38.

Hung Vuong, however, contends that Commerce could not permissibly invoke § 1677e(a)(2)(B) because "Commerce must still accept and consider the information if it nevertheless satisfies the statutory conditions of 19 U.S.C. § 1677m(e)." ECF 38-1, at 23.[39]

---

[39] Hung Vuong repeatedly mischaracterizes § 1677m(e) as qualifying the *entirety* of § 1677e(a). *See, e.g.,* ECF 38-1, at 20 ("Importantly, the statute also instructs that the

Section 1677m(e) provides that Commerce "shall not decline to consider information that is submitted by an interested party and is necessary to the determination but does not meet all the applicable requirements established by" Commerce *if* the information satisfies *all five* of the following requirements: (1) "the information is submitted by the deadline established for its submission"; (2) "the information can be verified"; (3) "the information is not so incomplete that it cannot serve as a reliable basis for reaching the applicable determination"; (4) "the interested party has demonstrated that it acted to the best of its ability in providing the information and meeting the requirements established by [Commerce] with respect to the information"; *and* (5) "the information can be used without undue difficulties." 19 U.S.C. § 1677m(e)(1)–(5). If the respondent fails to satisfy *any* of these five requirements, Commerce need not consider the deficient submission. *See Papierfabrik August Koehler SE v. United States*, 843 F.3d 1373, 1382–83 (Fed. Cir. 2016) (noting that "all five requirements in that subsection" must be satisfied).[40]

---

Department 'shall not decline to consider information that is submitted by an interested party and is necessary to the determination' if" the conditions listed in § 1677m(e) apply). Section 1677e(a), however, refers to § 1677m(e) in one location only—subparagraph (B) of paragraph (2). Section 1677m(e) does not apply to the other five circumstances listed in § 1677e(a) requiring Commerce to use "facts otherwise available."

[40] The statute does not define the words "best of its ability" as used in § 1677m(e)(4). The Federal Circuit has explained that those words have the same meaning, and are subject

Remarkably, however, Hung Vuong argues that *Commerce* must satisfy "the five enumerated requirements of 19 U.S.C. § 1677m(e) to enable it to decline an interested party's information for its final determination." ECF 38-1, at 20. Hung Vuong has it exactly backwards.

*Commerce* is not required to "meet" five requirements in order to "decline" information. Rather, as explained above, the statute says Commerce "shall not decline to consider" an interested party's submission of information "necessary to the determination" that does not meet all of Commerce's requirements if the *information submitted* satisfies five conditions that are linked together with the conjunction "and." In other words, it is the *respondent* (in this case, Hung Vuong) that must "meet the five enumerated [conditions]" before Commerce is required to consider that respondent's deficient submissions. *See Papierfabrik*, 843 F.3d at 1382–83. But Hung Vuong makes no effort to show how its information satisfied *all five* statutory conditions.

Here, Commerce found that Hung Vuong's submitted information failed to satisfy a number of § 1677m(e)'s five conditions. First, Commerce found that Hung Vuong's failure to retain source

---

to the same analysis, as the words "best of its ability" in 19 U.S.C. § 1677e(b)(1), the provision governing when Commerce may apply an adverse inference. *NSK Ltd. v. United States*, 481 F.3d 1355, 1360 n.1 (Fed. Cir. 2007). The Court addresses "best of its ability" more fully in Statutory and Regulatory Background Part B.4.b., *supra*.

documentation (as discussed above, *see* Analysis Part
II.A.) meant that Hung Vuong's control number re-
porting could not be verified, which is the condition set
forth in § 1677m(e)(2). The Court concludes that sub-
stantial evidence permitted that finding for the same
reasons stated above.

Second, Commerce found that Hung Vuong's data-
bases could not be deemed reliable for use in calculat-
ing an accurate dumping margin for Hung Vuong be-
cause of the lack of properly-reported control number
sales and factor-of-production data, which is the con-
dition set forth in § 1677m(e)(3). *See* ECF 25-5, at 32.
Commerce emphasized that "allocation methodologies
that average [control number] characteristics may re-
sult in a reporting methodology that is not accurate
because there is less variation in the calculation of
[normal value], even though there are clear differences
in the physical characteristics of the [control numbers]
and in the actual amount of inputs used." *Id.* at 31.

Hung Vuong does not really dispute this point in its
briefing, arguing only that it was "eminently reasona-
ble" to report averaged data because "[t]here are only
minor variations in the individual soaking percent-
ages of the separate production runs used to fill a spe-
cific invoice from day to day." *Id.* at 40. Commerce's
point, however, was that the unaccounted-for varia-
tions were the reason why the databases were unreli-
able. For example, as to one sales trace, Commerce's
review at verification revealed that Hung Vuong
should have reported five control numbers, but instead
Hung Vuong only reported one. ECF 25-5, at 30. The
Court understands this to mean that Hung Vuong's

factors of production data therefore could not properly be tied to the finished products, and the Court concludes that substantial evidence permitted Commerce to find the databases unreliable.

Third, Commerce expressly found that Hung Vuong failed to act to the best of its ability in meeting Commerce's control number reporting requirements, *see* ECF 25-5, at 30–31, which is the condition set forth in § 1677m(e)(4). The Court deems Commerce's finding in this regard supported by substantial evidence in view of (1) the *An Giang* decision in 2018 that found that Hung Vuong could have complied with the control number requirements, *see supra* note 31, and (2) counsel's statement at oral argument that it would have been "easy" for Hung Vuong to comply with Commerce's requirements, *see supra* note 37. Again, the Court concludes that if it would have been "easy" to comply, then noncompliance may reasonably be considered substantial evidence permitting a finding that Hung Vuong did not act to the best of its ability in attempting to comply with instructions.

As a result of the foregoing three findings, § 1677m(e) did not require Commerce to excuse Hung Vuong's failure to comply with Commerce's control number reporting requirements, and Commerce therefore permissibly invoked § 1677e(a)(2)(B) to apply facts otherwise available.

Commerce's invocation of § 1677e(a)(2)(B) is also subject to § 1677m(c)(1), which permits a party to ask

Court No. 19-00055                                    Page 72

Commerce to modify its reporting requirements.[41] Nothing in the administrative record shows that Hung Vuong ever made such a request, nor does anything in the record show that Hung Vuong suggested an alternative form for submitting the information prior to verification.

At oral argument, Hung Vuong's counsel confirmed that the company reported information in a different format from what Commerce required but did not seek approval first—instead, it used a different format, disclosed what it did, and explained its methodology. ECF 70, at 37:14–38:2 (Court's question) and 39:6–40:2 (counsel's answer).

Apparently on the theory that it is better to beg forgiveness than to ask permission, Hung Vuong tried to shortcut the process. Rather than explain the difficulty and suggest an alternate form of production, Hung Vuong unilaterally produced records in a different format without first obtaining Commerce's approval.

Hung Vuong now asks the Court to deem that alternative format acceptable. That decision is not the

---

[41] While 19 U.S.C. § 1677m(c)(1) requires Commerce to consider modifying its requirements to avoid placing an unreasonable burden upon a respondent, that requirement "only applies where a party notifies Commerce 'that such party is unable to submit the information requested in the required form and manner, together with a full explanation and suggested alternative forms . . . .' " *Maverick Tube Corp. v. United States*, 857 F.3d 1353, 1360–61 (Fed. Cir. 2018) (quoting § 1677m(c)(1)).

Court's to make. Hung Vuong should have made that request of Commerce before unilaterally proceeding with its own alternative methodology. *Cf. Diamond Sawblades Mfrs.' Coalition v. United States*, Slip Op. 18-146, at 10, 2018 WL 5281941, at *4 (CIT Oct. 23, 2018) (noting that respondent's provision of substitute data "would not have been necessary had it maintained full and complete records . . . in the first place") (cleaned up).

### ii. (a)(2)(D)—information could not be verified

As an alternative ground for resorting to facts otherwise available, Commerce cited 19 U.S.C. § 1677e(a)(2)(D), which applies when a party provides information that cannot be verified. As discussed above, the Court has already found that substantial evidence in the administrative record permitted Commerce's finding that Hung Vuong's control number reporting was not verifiable in the context of § 1677m(e)(2), and that analysis applies with equal force here.

Overall, Hung Vuong's arguments here are strikingly similar to those it unsuccessfully made in *An Giang*. Notably, Hung Vuong does not even dispute that it did not follow the control number methodology Commerce requires, instead arguing that its alternative methodology "was eminently reasonable as it reported accurate [factors of production] with no distortion as accurately as possible using existing records." ECF 38-1, at 39. But Commerce previously found, and the *An Giang* Court affirmed, that it was irrelevant

how Hung Vuong maintained its records because
Hung Vuong could have tracked information in the
way Commerce required.[42]

There is no reason for the Court to find otherwise
now. Hung Vuong has had even more time to revise its
practices to come into compliance—if, after all, Hung
Vuong had ample notice prior to the *11th* administra-
tive review, then it had even more notice prior to this
*14th* review. The government's brief states the issue
correctly and succinctly: ". . . [A]lthough this method-
ology may be 'eminently reasonable' according to
[Hung Vuong], it was *not* how Commerce directed
[Hung Vuong] to report its [control numbers] . . . ."
ECF 49, at 37 (emphasis in original).

Hung Vuong argues on reply that "Commerce's de-
cision in the eleventh review is not relevant inasmuch
as [Hung Vuong] devised a completely new and more
precise methodology in the current review." ECF 58,
at 19. The Court disagrees. The decision in the 11th
review remains relevant because it put Hung Vuong
on notice that Commerce, and this Court, would con-
tinue to require Hung Vuong to adhere to Commerce's
instructions or suffer the consequences of failing to do
so. Hung Vuong essentially admits it opted not to fol-
low Commerce's instructions and instead "devised" its
own reporting methodology. Whether Hung Vuong be-
lieves that methodology is "more precise" is immate-
rial, as Hung Vuong has admitted it did not report

---

[42] This is all the more so if, as Hung Vuong's counsel stated
at oral argument, it would have been "easy" for Hung
Vuong to comply. *See supra* note 37.

information in the required form. *Cf.* 19 U.S.C. § 1677e(a)(2)(B) (referring to a respondent's failure to provide information "in the form and manner requested").

Moreover, as discussed above, the obligation was on Hung Vuong to seek permission *in advance* for using its own non-compliant methodology, but Hung Vuong did not do so. Hence, while Hung Vuong's reply brief objects that the government "fails to address or analyze [Hung Vuong's] information and data showing that its methodology was reasonable and not distortive," ECF 58, at 20–21, the government had no obligation to conduct such an analysis, nor was Commerce obligated to explain why Hung Vuong's unilateral decision not to follow instructions was unreasonable. Thus, the Court need not dive into the weeds of Commerce's control number methodology and its overall meaning in the antidumping duty context. What matters is that Commerce found that Hung Vuong did not act to the best of its ability to provide the information in the form Commerce required. That is enough to sustain Commerce's decision to apply facts otherwise available.

### iii.  (a)(2)(C)—significantly impeding the proceeding

Finally, even if the Court were to conclude that substantial evidence did not permit Commerce's decision under either 19 U.S.C. § 1677e(a)(2)(B) or (D), the Court would alternatively sustain Commerce's invocation of § 1677e(a)(2)(C) finding that Hung Vuong had "significantly impeded" this proceeding for all of the

Court No. 19-00055                                    Page 76

same reasons cited above in view of Hung Vuong's ad-
mission that it did not follow instructions in reporting
its data even though it would have been "easy" to have
done so.[43]

Therefore, the Court concludes that substantial ev-
idence in the administrative record permitted Com-
merce to resort to facts otherwise available on the
"control numbers" issue.

### b. Adverse inference

After determining that it was necessary to resort to
facts otherwise available, Commerce determined that
it was appropriate to apply an adverse inference pur-
suant to 19 U.S.C. § 1677e(b)(1) "because [Hung
Vuong] has failed to cooperate to the best of its ability."
ECF 25-5, at 32. Commerce found that "[Hung Vuong]
had the records available to it to report accurate [con-
trol numbers] in its U.S. sales and [factors-of-

---

[43] Hung Vuong also repeats its argument that Commerce
violated 19 U.S.C. § 1677m(d) by not "*promptly*" notifying
Hung Vuong of deficient responses and providing an oppor-
tunity to cure. *See* ECF 38-1, at 41.

The Court's analysis of that argument in the context of
the "customers" issue also applies here. *See supra* Analysis
Part II.B.2.a. The administrative record shows that Com-
merce discovered the extent of the problems only at verifi-
cation, and Hung Vuong makes no attempt to demonstrate
how Commerce could or should have determined at an ear-
lier date that Hung Vuong's submissions were deficient
and thereby triggered the "notice-and-opportunity-to-cure"
provision. Because the Court concludes that § 1677m(d) is
inapplicable at the verification stage, Hung Vuong's argu-
ment fails again here.

production] databases." *Id.* Commerce noted that because the Court had previously "sustained Commerce's decision to require [Hung Vuong] to maintain records on a [control number–]specific basis," Hung Vuong was an experienced respondent and "should have taken reasonable steps to keep and maintain full and complete records documenting the information that an experienced respondent should anticipate being called upon to produce." *Id.* Commerce concluded that Hung Vuong's failure to cooperate resulted in the company's databases being unusable for purposes of calculating an accurate dumping margin. *Id.*

As is thoroughly discussed above, Hung Vuong does not dispute that it did not report control numbers in the manner required by Commerce. If, as counsel said at oral argument, it would have been "easy" for Hung Vuong to comply with Commerce's instructions, *see supra* note 37, then there was no excuse for failure to comply. Hung Vuong has effectively admitted that it failed to cooperate to the best of its ability. Therefore, substantial evidence permitted Commerce to conclude that Hung Vuong failed to cooperate such that an adverse inference was appropriate.

### D. Factors of Production[44]

#### 1. Commerce's findings

The parties dispute the accuracy of Hung Vuong's reported factors of production in two specific ways.

---

[44] This discussion corresponds to Commerce's findings in ECF 25-5, at 32–35.

First, Commerce found that Hung Vuong does not track the number of hours its employees work, but rather just tracks their attendance, and that the employees work as many (or as few) hours as are necessary to process all the fish fillets, without regard to the number of hours in a working day. ECF 25-5, at 34.

Second, Commerce found that Hung Vuong's factors of production were inaccurate due to an issue with the weight of fish byproducts. In reporting its factors of production, Hung Vuong divided the amount of whole live fish produced or fish byproducts (depending on the particular factor of production at issue) by the amount of fish fillets produced, "resulting in a ratio of whole live fish needed to produce one kg of fillet." *Id.* at 33. Commerce determined there was a problem: "At verification . . . Commerce discovered that the [period-of-review] weight total of unsoaked fillets, plus the total weight of the by-products[,] was many millions of kgs higher than the total weight of the whole live fish consumed by [Hung Vuong] during the [period of review]. Put another way, the output was much higher than the input, which is a mathematical impossibility." *Id.*

Commerce noted that Hung Vuong was unable to explain the discrepancy. "This calls into question the accuracy of all [Hung Vuong's factors of production], and not just its whole live fish and by-products [factors of production], because it is the weight of the fillets that is the denominator for all of [Hung Vuong's factors of production]." *Id.*

**2. The administrative record did not permit Commerce to apply facts otherwise available with an adverse inference as to the fish byproducts portion of Hung Vuong's factors of production data.**

### a. Facts otherwise available

In view of its findings regarding Hung Vuong's factors of production, Commerce invoked 19 U.S.C. § 1677e(a)(1) and (a)(2)(A), (C), and (D) to apply facts otherwise available as to both labor and fish byproducts. The Court addresses each in turn.

### i. *Labor costs*

Commerce questioned Hung Vuong's labor factor of production, noting that Hung Vuong assumes an eight-hour workday but does not actually track the number of hours its personnel work. Commerce sought to probe the accuracy of the eight-hour day estimate but was unable to do so, and Commerce further noted that at verification the plaintiffs stated that workers are paid based on their production and work as many hours as are needed to process all the fish fillets. *See* ECF 25-5, at 34.

In response, Hung Vuong contends Commerce should have applied a presumption of an eight-hour workday, citing a Federal Register notice:

The Department [i.e., Commerce] selects from the following categories in the following hierarchy: (1) per hour; (2) per day; (3) per week; or

(4) per month. Where data is not available on a per-hour basis, the Department converts that data to an hourly basis *based on the premise that there are 8 working hours per day*, 5.5 working days a week, and 24 working days per month.

*Antidumping Methodologies in Proceedings Involving Non-Market Economies: Valuing the Factor of Production: Labor*, 76 Fed. Reg. 36,092, 36,094 n.4 (Dep't Commerce June 21, 2011) (emphasis added), *cited in* ECF 38-1, at 44.

At oral argument, the Court asked the government's counsel why Commerce did not apply this presumption in this case. Counsel explained that verification revealed that Hung Vuong's workers have no fixed schedule—one day, they might work 13 hours, whereas another day, they might work two hours, and it all depends on the size of the pile of fish in front of a given worker on a given day, such that the concept of a standard eight-hour workday is simply not how Hung Vuong operates. ECF 70, at 78:22–81:10.

Hung Vuong's pre-verification submissions stated the company assumes an eight-hour workday, but Commerce's final decision notes that

[a]t verification [Commerce] attempted to determine whether this was an accurate estimate, but rather than stating that the regular work day at [Hung Vuong] was eight hours, we found that Hung Vuong does not track workers at all, just attendance. [Hung Vuong] stated that workers are paid based on their production, and assumes

workers work an eight hour day, but also admit-
ted that workers work until there are no more
fillets to process.

ECF 25-5, at 34. The verification report also noted that
"pay is based on results, not hours," that "[c]ompany
officials stated that whenever raw material deliveries
are finished for the day, and there is nothing left to
process, that is when the day would end," and that
workers' timesheets included a code reflecting double
shifts. ECF 61-1, at 927. Based on all the foregoing,
Commerce found that "we cannot assume that an eight
hour work day is a reasonable estimate of the number
of hours worked." ECF 25-5, at 34.

In sum, Commerce's point is that the administra-
tive record did not allow Commerce to verify the accu-
racy of Hung Vuong's reported labor factor of produc-
tion. *See id*. at 35 ("[W]e cannot verify that its basis for
reporting labor hours is accurate."). The Court con-
cludes that substantial evidence permitted Commerce
to reach that conclusion and to invoke 19 U.S.C.
§ 1677e(a)(2)(D) to apply facts otherwise available.[45]

---

[45] As discussed above in connection with the customers is-
sue, *see supra* Analysis Part II.B.2.a., the Court concludes
that 19 U.S.C. § 1677m(d) does not apply in the verification
context, but even if it did apply, Commerce's statutory
deadline for completing its work would have made it im-
practicable for Commerce to provide Hung Vuong the op-
portunity to remedy the deficiency.

### ii. Fish byproducts

The government and the intervenors both note that at verification, Commerce discovered a discrepancy between the input—whole live fish—and the output—fish fillets and byproducts—in which the output weighed several million kilograms more than the input.[46] Commerce noted that this is "a mathematical impossibility" and stated that when the personnel conducting verification asked Hung Vuong to explain the discrepancy, Hung Vuong could not do so and simply said the "math was not exact" and the numbers were correct. ECF 25-5, at 33. Commerce found this discrepancy rendered all of Hung Vuong's factors of production unreliable. *Id.*

Hung Vuong argues that the discrepancy between the input and output weights occurs because the production process involves throwing fish byproducts on the floor, where they are exposed to some unknown amount of water that accumulates with the byproducts when they are cleaned up off the floor. ECF 38-1, at 42–43. Commerce's final decision contended that Hung Vuong's post-verification briefing "attempts to explain away this discrepancy as water weight gain by the by-products," and Commerce questioned this argument because Hung Vuong "has never claimed that it soaks its by-products to add to their weight, and there is no compelling evidence on the record to support such a conclusion." ECF 25-5, at 33. Commerce suggested

---

[46] In the interest of comparing this figure to more familiar measurements, the Court observes that a kilogram is equivalent to 2.20462 U.S. pounds.

that "there may be little need for [Hung Vuong] to soak its fillets because they too might naturally absorb water like its by-products." *Id.*

At oral argument, the Court asked whether the administrative record *prior to* the post-verification briefing demonstrated that Hung Vuong's explanation was not simply a *post hoc* rationalization as suggested by Commerce. ECF 70, at 43:24–45:25. In response, Hung Vuong submitted two excerpts from the administrative record.

The first is an excerpt from Hung Vuong's response to Commerce's Supplemental Section D questionnaire, in which Hung Vuong explained as follows:

> It is common industry practice and well understood within the industry that byproducts must be collected and disposed of immediately (to prevent spoilage, etc.). Thus, the byproducts are collected as they accumulate, and this also includes some amount of water that commingles with the byproducts (as part of the overall manufacturing process). The byproducts and commingled water are collected together into buckets (*this includes water that collects on the floor along with the by-products*, etc.). This additional water weight is then included as part of the by-product weight that is sold to those consuming the by-products. As such, the by-product weight actually includes both the by-products and the weight of water collected with the by-products.

ECF 69-1, at 8–9 (emphasis added).

Court No. 19-00055                                      Page 84

The second record excerpt Hung Vuong submitted consists of a two-page excerpt from its response to Catfish Farmers' pre-preliminary comments before Commerce issued its preliminary determination. Hung Vuong reiterated the points made in its questionnaire response and then referred Commerce to the company's questionnaire answers, which Hung Vuong said compared the input and output figures without the added byproduct water weight. ECF 69-2, at 8 (citing Exhibit SDQ-41(a) of Hung Vuong's supplemental Section D response).

Commerce explained that at verification, the on-site personnel could not explain the discrepancy and simply said the "math was not exact." ECF 25-5, at 33. The Court recognizes the validity of Commerce's concern that if the "math was not exact," it calls into question the accuracy of Hung Vuong's reported data. Nevertheless, and critically for present purposes, Commerce's final decision nowhere addressed Hung Vuong's explanation of why the byproducts gained water weight nor the data Hung Vuong submitted in its questionnaire answers that the company characterizes as comparing input and output figures without the added byproduct water weight.

In determining whether the administrative record contains substantial evidence permitting Commerce's final decision, the Court must consider evidence that supports as well as evidence that fairly detracts from the substantiality of the evidence. *Nippon Steel*, 337 F.3d at 1379. Because Commerce's final decision did not address Hung Vuong's explanation for the byproducts' weight gain, the Court concludes that

Court No. 19-00055                    Page 85

Commerce's finding on that issue is not supported by
substantial evidence and is therefore not permissible.
*See, e.g.*, *SeAH Steel VINA Corp. v. United States*, 950
F.3d 833, 846 (Fed. Cir. 2020) (discussing procedural
history of case in which CIT remanded twice, first for
further explanation of Commerce's findings and again
when Commerce pointed to certain record evidence but
did not address the respondent's counterarguments);
*see also SeAH Steel VINA Corp. v. United States*, 269
F. Supp. 3d 1335, 1365 (CIT 2017) (remanding to Com-
merce for second time, noting that Commerce failed to
address respondent's counterarguments beyond a sin-
gle sentence saying there was no evidence on the rec-
ord supporting respondent's position, and finding that
"[u]ntil Commerce explains why, despite SSV's chal-
lenges, its decision is correct, the court cannot find
that Commerce's decision was consistent with the law
and supported by substantial evidence").

Moreover, because Commerce cited this issue as the
basis for discrediting *all* of Hung Vuong's factors of
production, ECF 25-5, at 35 (finding all Hung Vuong's
factors of production unreliable "because the founda-
tion of its reporting is based on a mathematical impos-
sibility"), the Court cannot sustain Commerce's final
decision despite finding the remainder of Commerce's
analysis to be supported by substantial evidence and
therefore permissible. At oral argument, counsel for
Catfish Farmers explained that if a respondent (here,
Hung Vuong) cannot support its reported factors of
production, Commerce cannot confirm that the factors
are not understated. This matters because under-
stated factors of production would result in a product
having a lower normal value and, by extension, lower

dumping margins. Catfish Farmers argued that—as Commerce found following verification—the issues with Hung Vuong's factors of production warranted rejecting all of Hung Vuong's data because the factors of production are at the heart of Commerce's dumping determination. ECF 70, at 85:5–86:18.

Even accepting all these arguments, however, the problem is that Commerce rejected *all* the factors of production based on its finding that Hung Vuong could not explain the byproducts' weight gain, but there is nothing in the administrative record showing that Commerce considered (much less addressed) Hung Vuong's previously-offered explanation for that issue. Because Commerce viewed this issue as essential to its analysis, the Court cannot sustain Commerce's decision to apply total facts otherwise available as to Hung Vuong's factors of production.

Commerce failed to address Hung Vuong's submission explaining the reason for the water weight gain, which might have demonstrated that the figures were not "mathematically impossible." If, in turn, the administrative record contradicted the "mathematically impossible" conclusion, that would call into question Commerce's assumption that the "foundation" of Hung Vuong's factors of production reporting was invalid. Commerce must therefore thoroughly address that issue and reconsider its final decision in view of that issue, including, but not limited to, whether to disallow the byproduct offset as Hung Vuong suggests, *see* ECF 58, at 22, and whether to apply partial facts available instead of total facts available as to the factors of

production issue. The Court will therefore remand this matter to Commerce for that purpose.

### b. Adverse facts available

Invoking 19 U.S.C. § 1677(b) to apply an adverse inference as to the factors of production issue, Commerce found that Hung Vuong had failed to cooperate to the best of its ability "because the foundation of its reporting is based on a mathematical impossibility." ECF 25-5, at 35. Thus, on remand, in addition to reconsidering Hung Vuong's original submission on the byproduct issue, Commerce is to consider the extent to which its conclusion as to that submission affects its decision on the adverse inference as to the factors of production, including whether a partial or total adverse inference is justified, and is to thoroughly explain the reason for its decision on that issue in the remand determination.

### E. The Court Is Required to Remand Commerce's Decision to Apply "Total AFA."[47]

After addressing the four specific issues discussed above, Commerce applied what it called "Total AFA." As discussed above, *see supra* Statutory and Regulatory Background Part B.4., "AFA" is jargon for Commerce using "an inference that is adverse to the interests of that party in selecting from among the facts otherwise available." 19 U.S.C. § 1677e(b)(1)(A). The Court's analysis up to this point has discussed

---

[47] This discussion corresponds to Commerce's findings in ECF 25-5, at 35–36.

Court No. 19-00055                    Page 88

whether the administrative record permitted Commerce's resort to "facts otherwise available" and "adverse inferences" as to four particular issues. The analysis of Commerce's "Total AFA" discussion, in contrast, focuses on the case as a whole—whether substantial evidence in the administrative record permitted Commerce to apply "Total AFA."

Commerce cited the "many deficiencies listed above" as the basis for applying some level of facts otherwise available with an adverse inference. ECF 25-5, at 35. Commerce stated that its findings demonstrated that Hung Vuong "failed to cooperate to the best of its ability by not providing complete and accurate responses to Commerce's requests for information in the form and manner request [sic], significantly impeded the proceeding, and provided information which could not be verified. In addition, certain necessary information is missing from the record." *Id.* Commerce therefore tied the deficiencies it identified in Hung Vuong's questionnaire answers—which were the basis for using "facts otherwise available"—to Hung Vuong's failure to cooperate "by not acting to the best of its ability to comply with a request for information from" Commerce, which is the statutory prerequisite for application of an adverse inference. 19 U.S.C. § 1677e(b)(1).

Commerce then considered whether it should apply "partial" or "total" facts otherwise available with an adverse inference. Commerce found that Hung Vuong's failure to cooperate rendered the company's questionnaire answers completely unreliable and unusable such that "we cannot accurately calculate a

dumping margin for [Hung Vuong] pursuant to section 773(a) of the Act [i.e., 19 U.S.C. § 1677b(a)]." ECF 25-5, at 35. Commerce further found that "[t]he use of partial AFA is not appropriate because the missing information, *i.e.*, data needed to calculate [Hung Vuong's] dumping margin, is core to our analysis and it would be unduly difficult to apply partial AFA by selecting from the facts available to remedy each of the deficiencies that impact each sale." *Id.* at 36.

"Depending on the severity of a party's failure to respond to a request for information and failure to cooperate to the best of its ability, Commerce may select either partial or total AFA." *Fresh Garlic Producers Ass'n v. United States*, 121 F. Supp. 3d 1313, 1324 (CIT 2015). The Federal Circuit has suggested that "partial" application may be appropriate where deficiencies are limited to particular portions of the administrative record such that Commerce can use other portions of the respondent's submissions. *See Mukand, Ltd. v. United States*, 767 F.3d 1300, 1307–08 (Fed. Cir. 2014). This rule exists because Commerce is to use "facts otherwise available" to fill in actual gaps in the administrative record, *Bebitz Flanges Works Private Ltd. v. United States*, 433 F. Supp. 3d 1309, 1317 (CIT 2020), and the statute allows Commerce to employ an adverse inference only in the process of "selecting from among the facts otherwise available," 19 U.S.C. § 1677e(b)(1)(A).

But the "use of partial facts available is not appropriate when the missing information is core to the antidumping analysis and leaves little room for the substitution of partial facts without undue difficulty."

*Mukand*, 767 F.3d at 1308. Instead, a "total" application "is used by Commerce in situations where none of the reported data is reliable or usable. . . . Commerce can ignore all data submitted where the bulk of it is determined to be flawed and unreliable." *Zhejiang Dunan Hetian Metal Co. v. United States*, 652 F.3d 1333, 1348 (Fed. Cir. 2011).

Here, Commerce did make a finding that the problems it had with the administrative record were "core" to the Department's analysis and that it would be "unduly difficult" to do anything other than to apply total facts otherwise available with an adverse inference. However, for the reasons discussed above, it is unclear from the existing record whether there was substantial evidence permitting Commerce to resort to facts otherwise available—and, by extension, an adverse inference—on (1) the customer relationship issue due to its failure to give Hung Vuong notice of the customers' failure to answer Commerce's questionnaires and (2) the factors of production issue due to Commerce's failure to address Hung Vuong's original submission on the water weight gain of the fish byproducts.

The Court is therefore required to vacate Commerce's application of "total AFA" in view of those two issues. On remand, Commerce must reconsider whether (1) its failure to give Hung Vuong notice of its customers' failure to answer Commerce's questionnaires and (2) its reassessment of the byproducts issue would allow for application of "partial AFA" and must thoroughly explain its rationale for whatever conclusion it reaches.

## F. The Rate Commerce Applied Must Be Reconsidered on Remand.[48]

After finding it appropriate to apply facts otherwise available with an adverse inference, Commerce looked to the prior administrative reviews of the antidumping order at issue in this case and selected the highest rate applied to any respondent, $3.87 per kilogram. ECF 25-5, at 37. Hung Vuong objects to the assigned rate as "arbitrarily punitive," ECF 38-1, at 47, and contends that Commerce needed to explain why it did not choose some other lower rate. Hung Vuong does appear to concede, however, that the purpose of applying an adverse inference is to ensure that a party does not benefit from its own lack of cooperation. *Id.* at 48.

The Court need not address either Hung Vuong's objections to the rate or the government's arguments in support of it. Because the Court must remand this matter to Commerce for further consideration of the customer relationships issue as discussed *supra* in Analysis Part II.B.2.a.–b. and Hung Vuong's byproduct data as discussed *supra* in Analysis Part II.D.2.a.ii., the Court cannot sustain Commerce's application of the $3.87/kg rate in this case. On this record, the Court is unable to determine whether Commerce permissibly applied a total adverse inference. Accordingly, Commerce is to reconsider the rate on remand in conjunction with its reconsideration of the

---

[48] This discussion corresponds to Commerce's findings in ECF 25-5, at 36–37.

Court No. 19-00055                        Page 92

customer questionnaire and byproduct issues and the
total adverse inference.

* * *

## Order

For all the foregoing reasons, the Court remands
this matter to Commerce for further proceedings con-
sistent with this opinion. Accordingly, upon consider-
ation of all papers and proceedings in this action, it is
hereby

**ORDERED** that Plaintiff's motion for judgment on
the agency record (ECF 38) is **GRANTED IN PART
AND DENIED IN PART**, and it is further

**ORDERED** that this case is **REMANDED** to the
Department of Commerce with instructions that the
Department reconsider (1) its findings on Hung
Vuong's relationship with its customers in view of
Commerce's failure to comply with its obligations un-
der 19 U.S.C. § 1677m(d) to notify Hung Vuong of de-
ficiencies in the customers' questionnaire answers and
to provide an opportunity to remedy them, (2) its find-
ings on the Hung Vuong Group's byproduct data and
the effect those findings have on Commerce's overall
decision, and (3) the antidumping rate applied to the
Hung Vuong Group in view of the reconsideration of
the two foregoing issues, and it is further

**ORDERED** that this case will proceed with the fol-
lowing schedule:

Court No. 19-00055                          Page 93

1. Commerce must file its remand determination on or before 120 days after the date of entry of this opinion and order;

2. Commerce must file the administrative record on or before 14 days after the date on which it files the remand determination;

3. The parties' post-remand comments must be set in either 13- or 14-point type, except that 12-point type may be used for footnotes;

4. Plaintiffs' comments in opposition to the remand determination must be filed on or before 30 days after Commerce files the administrative record;

5. Defendant's comments in support of the remand determination must be filed on or before 30 days after Plaintiffs file their comments in opposition;

6. Intervenors' comments in support of the remand determination must be filed on or before 15 days after Defendant files its comments in support and may contain no more than half the word count applicable to Defendant's comments pursuant to the Court's Standard Chambers Procedures;

7. The joint appendix must be filed on or before 14 days after the date on which the last comments in support of the determination are filed, and the Court will issue an order giving the parties further direction on how to format the joint appendix and how to cite the administrative record in their post-remand comments; and

Court No. 19-00055                                          Page 94

    8.  Motions for further oral argument, if any, must be filed on or before the due date for the joint appendix.

Dated:  December 3, 2020       */s/ M. Miller Baker*
          New York, New York    Judge